In re HOFFECKER

(Court of Chancery of Delaware. May 8, 1905.)

NICHOLSON, Chancellor: The duty imposed upon the court by such a case as this is peculiarly painful, and I cannot refrain from expressing my profound appreciation of the assistance rendered to the court by the gentlemen who appeared for the rule, and also my appreciation of the exhaustive and vigorous presentation of the respondent's case by his counsel, and of the fact that the character and ability of that distinguished solicitor of this court give me the assurance that nothing has been left undone or unsaid that could be done or said in defense of the respondent to the rule. There are no disputed facts in the case. The motion to make the rule absolute is based upon the respondent's own testimony and admissions, and nothing will be considered by me in its decision that is not admitted to be true by the respondent's own testimony, or that does not appear over his own signature. It should also be borne in mind that this proceeding does not concern the respondent's connection with the law courts of the state, that his position as attorney at law is absolutely independent of his position as solicitor in chancery, and that this rule can only affect his position as a solicitor of this court.

The two elaborate briefs filed by his counsel contain many citations of English and American cases, and are directed mainly to a consideration of the grounds upon which a solicitor in chancery may properly be stricken from the rolls, or an attorney at law be disbarred; and he says that "no case can be found where a solicitor's name has been, in England, stricken from the rolls, or, in America, a lawyer disbarred, for any alleged unprofessional conduct in pecuniary matters, when such conduct did not amount to mala fides, as shown by a misappropriation of property to his own use." He also contends that "the acts for which it is sought to strike the respondent from the rolls were acts done by him qua trustee, and not as solicitor of the court." And he claims that on that account even grosser misconduct must be shown to justify the striking of his name from the rolls of the Court of Chancery. It is obvious, however, that cases in which attorneys have been disbarred because of heinous offenses or gross fraud do

not carry any inference that the same courts would not have disbarred them for misconduct less gross. Nor do cases where courts have refused to disbar or have questioned the propriety of disbarring a lawyer charged with an indictable offense, which he has not confessed, and for which he has not been tried and convicted, appear in any respect relevant to the present case. The cases belonging to the latter class are summed up by the Supreme Court of the United States in *Ex parte Wall,* 107 *U.S.* 281, 2 *Sup.Ct.* 582, 27 *L.Ed.* 552, as follows: "But when the acts charged against an attorney are not done in his official character, and are indictable, and not confessed, there has been a diversity of practice on the subject. In some cases it is laid down that there must be a regular indictment and conviction before the court will proceed to strike him from the rolls; in others, such previous conviction being deemed unnecessary."

There is no doubt or ambiguity, however, about the law and practice of the courts. The principles guiding the courts of common law and courts of equity in both England and America in the exercise of their jurisdiction to preserve the integrity and maintain the standard of their respective bars by striking a solicitor or attorney from the rolls of the court are set forth in a line of decisions dating back beyond Lord Mansfield. Many of the most instructive and important cases are so fully reviewed and commented upon by the Supreme Court of the United States in the case above cited of *Ex parte Wall,* 107 *U.S.* 265, 2 *Sup.Ct.* 569, 27 *L.Ed.* 552, that it would be sufficient for me to cite that case only, but I will also cite the case of *Fairfield County Bar ex rel. Samuel Fessenden et al. v. Howard W. Taylor, Appt.,* decided on appeal by the Connecticut Supreme Court of Errors, and reported, with notes, in 13 *L.R.A.* 767. I will also quote at length from a case decided by Sir John Romilly, Master of the Rolls, and cited by the counsel for the respondent, because of its similarity to the case at bar in some essential points. *In re Chandler, 22 Beavan, p.* 253. In that case, stock was invested in the names of Mr. Chandler, a solicitor, and Mr. Worsley; Chandler, in right of his wife, being entitled to one-third in reversion. Chandler prevailed upon Mr. Worsley, his co-trustee, to join in executing a power of attorney to sell off the stock, and to allow him (Chandler) to place the proceeds

to his own account at his banker's. This being done Chandler applied the money to his own use, but continued to pay the dividends to the person entitled until he became insolvent, when it became known that he had misapplied the funds, and a petition was presented to have him struck off the rolls. His counsel, upon the hearing of the petition, claimed that "the act done by him, though constituting a breach of trust, was done in his character as trustee, and not of solicitor, and with no fraudulent intent. Mr. Chandler had interest in the fund, and naturally wished to improve it, and, when he had the money placed to his account at his bankers, he possessed a large amount of property and thought the trust fund quite safe; but unfortunately it turned out otherwise. He did not intend to wrong any one, nor was there any concealment, for the money was duly entered in his own books to the proper account, and there is no reason to say he was solicitor of the trust. He is not, therefore, amenable to the summary jurisdiction of the court in respect of a matter not relating to his professional conduct." The master of the rolls, Sir John Romilly, delivered the following opinion: "It is said that Chandler was not the solicitor of the trust, and that he has not made any professional charges against the estate. But he was a trustee and, so far as the services of a solicitor were required, he had acted as such, or at least there does not appear to have been any other solicitor employed. He knew it was a breach of trust to sell out the stock; he knew he could not do so without the consent of his co-trustee; and, knowing this, he induced his co-trustee to join in executing the power of attorney to sell out, and that obviously for his own purposes, he having, at the time, no security or investment in view to justify him in keeping the money at his banker's for that purpose, but he kept it there and applied it to his own use. This is a course of conduct which solicitors are bound to keep themselves free from. They are placed in a position of a high trust, and happily it is very rare that the court is called upon to bring them to account in this manner. They are commonly appointed trustees from the fact that their being solicitors of this court gives them the stamp of trustworthiness, and marks them as persons in whom confidence may without hesitation be reposed. I cannot, therefore, allow this gentlemen, who has shown his unfitness for the office he holds, to remain in a situation to do injury to others

who might be induced to trust him; and therefore, though there is this extenuating circumstance in his favor, that the fund does not wholly belong to other persons, I must strike him off the rolls of the court."

I shall not set forth at length the terms of the trust as expressed in the will of Joseph Teas, under which Mr. Hoffecker was appointed trustee by the chancellor, but only state that the property of the testator was to be held by the trustee during the lifetime of his three daughters, and the survivors of them, the income of the estate to be paid to the beneficiaries for life, and that after the death of the survivor of his daughters, which occurred in the year 1904, the whole of the beneficial interest of the said trust estate belonged to, and was absolutely vested in, his four grandchildren; that is to say, Mrs. E. H. Bramble, the only child of the testator's daughter Clara, the petitioner upon whose application the appointment of a master was made to examine and pass upon the trustee's accounts, and three children of his daughter Ellen J. Stotsenberg, the children taking their parent's share, etc. The will also provided that the trustee, with the concurrence of a majority of his daughters at the time living, should have the power to sell, dispose of, or exchange any of the property, and to invest the same, the substituted securities to stand in the place of the originals, etc., and from time to time to change any securities or investments, if, in his judgment, the interests of the estate could be better subserved by so doing. The securities and property which constituted the estate of Joseph Teas, the testator, at the time it came into the hands of Mr. Hoffecker as trustee, as shown by his accounts, and specifically as set forth in the master's report, consisted of investments as valuable and conservative (largely local) as are known to the investing public in this community. The master's summarized statement in the concluding part of his report shows that all but three of the original investments held by the trustee on October 4, 1889, had been sold and disposed of by the trustee since that date, and that he had received in cash therefrom the sum of $80,322.50. The correctness of this statement of the amount received was denied by the respondent in his answer through mistake, but was admitted by his counsel at the hearing of the rule. A large part of the sum or

principal of the estate was paid by the trustee, according to his statement made before the master, to the beneficiaries for life, who were entitled to the income only, and the balance invested in other alleged securities, all of which were sold or disposed of by the trustee pursuant to the order of the chancellor before the hearing of the rule, and the total amount of cash realized from them all was less than $100.

In my judgment, it is not necessary for me to refer to more than two of these investments, or to the conduct of the trustee in other matters pertaining to the trust. One (the Cedartown Company), as stated in the master's report, was a land and improvement company to develop a town of that name in the northern part of the state of Georgia; and, in addition, it had under its control and management other subordinate companies which dealt in cotton, etc. In this company the trustee invested $8,100 of the trust funds, for 88 shares of the stock, which stock he sold at public auction, after ample advertisement of the sale, for $36.08. In this company, according to Mr. Hoffecker's own testimony before the master, he was a director at the time of his investment in it of the trust funds, and was assisting in promoting the enterprise in the sale of the stock.

The other investment to which I will refer is the Hockessin Kaolin Company. This the master describes as "a corporation created May 29, 1900, for the purpose of digging and dealing in certain supposed valuable clay deposits in Mill Creek hundred, New Castle county, Delaware," and he reports that from all the sworn evidence in the cause from the books and records of the said company, and from the admissions of the trustee himself, the company was a corporation originally promoted, organized, and controlled by the trustee for speculative purposes, both for the trust and himself individually. He was largely and personally interested in it. According to his own testimony, he had invested some $16,500 of his own money in subscription to the capital stock, and subsequently advanced further large sums for equipment and other purposes; and he at the same time invested the funds of the trust, to the amount of $36,000, in this company.

The complete history of Mr. Hoffecker's use of the trust funds in connection with this interprise is long and intricate, covering a number

of years, and it can be read at length in Mr. Hoffecker's own testimony before the master, the records of the company, and the papers filed by him as exhibits at the hearing of this rule. It is claimed in justification of this use of the trust funds that it was for the purpose of protecting a mortgage which the trust estate held against the Chamberlain farm, purchased and worked by the Kaolin Company. This farm had been conveyed by Mr. and Mrs. Isaac T. Chamberlain, then the owners, to one Miller, as the Chamberlains claim, to secure the repayment of a debt due from them to him, although it was an absolute conveyance in form. Mr. Hoffecker, acting for the Chamberlains, obtained from Miller a deed reconveying the farm to the Chamberlains by tendering and paying said Miller in actual cash about $11,500, which, according to his own testimony, was money realized by him from securities belonging to the Teas estate, which he had sold. Other money of the Teas estate was used in this transaction, and Mr. Hoffecker testifies that it was all intended to be secured by a mortgage to be executed by the Chamberlains. After the deed was obtained they refused to execute the mortgage, and thereupon Mr. Hoffecker filed his bill in equity individually, duly sworn to by him, in which he alleged that, representing the Chamberlains, he had prevailed upon Miller to execute the conveyance of the farm to them, and that he had advanced and paid to the said Miller for the benefit of the Chamberlains, they being unable so to do, the sum of $11,500, and had also paid the sum of $500 to their solicitor in a former suit against Miller, and the sum of $57.32 costs in that former suit. The result of this litigation was that, about two years after the advances thus made by Mr. Hoffecker, the Chamberlains executed to him personally a mortgage for $14,100, which mortgage one month afterwards he assigned to himself as trustee of the Teas estate. In the difference between the amount paid Miller and the total amount advanced from the trust funds in his hands, Mr. Hoffecker has testified that there was included his compensation as counsel for the Chamberlains.

From the time of the assigning of this mortgage, it appears that numerous efforts were made to develop the Chamberlain property, all of which efforts resulted in failure and loss to those engaged

therein. For some reason, however, Mr. Hoffecker seems to have believed that money was to be made from developing the property. With this end in view, in the year 1900 he organized a corporation known as the Hockessin Kaolin Company, the original incorporators of which were John Burgess, Leonard E. Wales, Jr., and Thomas J. Bowen, Jr.; the two latter being then in Mr. Hoffecker's office. This corporation had an authorized capital stock of $100,000, divided into 1,000 shares, of the par value of $100. On July 3, 1900, Mr. Hoffecker, as trustee and individually, made a written proposition to sell to that company, for the sum of $117,200, the land in Mill creek hundred, title to which he had acquired under foreclosure proceedings had under the above mortgage, together with certain buildings, machinery, etc., thereon, and was to receive in consideration therefor $100,000 in the stock of the company, to be issued to him as trustee, and the balance, amounting to $17,200, to be an open account with the company and payable to him personally; in the same proposition suggesting that a mortgage should be negotiated to pay the open account with him. Previous to this time Mr. Hoffecker had used the money of the Teas estate, realized from the sale of securities, to the extent of about $18,000, in buying and paying for machinery, tools, etc., in connection with the Kaolin property; this, in addition to what the Teas estate had before in the property, making a total of upwards of $36,000. Mr. Hoffecker also claims to have placed $16,500 of his own money in the same enterprise. Under the above proposition, which was accepted by the company, and which was afterwards acted upon by the execution of a mortgage for $20,000 given to Mr. Hoffecker, the Teas estate was to receive stock for its interest, and Mr. Hoffecker individually was to receive the obligation of the company to repay him the amount he claimed to have advanced. Notwithstanding the arrangement made, the stock of the Hockessin Kaolin Company, when issued, as will appear from the testimony taken before the master, was divided by Mr. Hoffecker so that he held as trustee 550 shares; he gave himself individually 227 shares; he gave to John W. Burgess 115 shares, and to various other persons the remaining capital stock.

It is unnecessary to pursue further the history of the Hockessin Kaolin Company, and Mr. Hoffecker's dealings with the trust fund

in connection with it, ending with the insolvency of the corporation and the loss of all the money invested, for, as already stated, it may be read fully in detail in the testimony before the master, and in the answer and exhibits of the respondent produced at the hearing of the rule. The partial review of it which I have already made is sufficient to show Mr. Hoffecker's method of dealing with the fund committed to his charge as trustee under the will of Joseph Teas.

The solicitors for the rule, moving that the rule be made absolute, submitted that the following facts appear from the testimony before the master: "(1) That the trust estate which came into the hands of Mr. Hoffecker was wisely, safely, and securely invested in conservative securities, and that from time to time these securities have been disposed of, and the proceeds therefrom used in ways neither warranted by the trusts declared in the will, nor by the well-recognized rules governing the investment of such funds by trustees, which has resulted in the complete and total destruction of the trust fund, and that this was done by a solicitor of the Court of Chancery. (2) That the trust funds were used by the trustee for the promotion of speculative industrial enterprises in which he, in his personal capacity, was interested. (3) That the trust estate was used by the trustee for his own personal advantage, and at least with the hope of making profit to himself in his individual capacity. (4) That the funds belonging to the trust estate were used by Mr. Hoffecker for purposes entirely disconnected with the trust under which it was held, and for the furtherance of his own or his clients' interests." And they conclude "that his transactions in using the trust estate directly or indirectly for his own advantage and benefit, and thereby completely wasting and dissipating it, do not in any sense constitute a mere error in judgment, but show an utter disregard of the trust reposed in him in his capacity as trustee, and likewise such utter disregard of the well-settled and well-known principles of law and ethics as to render Mr. Hoffecker's further continuance as a solicitor in this court impossible."

The whole of the testimony and all the papers and exhibits filed by the respondent have been read and re-read by me, laboriously compared, and carefully considered in the light of all that has been

urged in the respondent's favor by his counsel. In view of it all, and the considerations I have hereinbefore adduced, I am constrained to hold that these charges have been completely sustained, and that the conclusion based upon them by the solicitors for the rule is inevitable. As was the case with Mr. Chandler in the cause I have quoted from Beavan, Mr. Hoffecker was not only a trustee, but, so far as the services of a solicitor were required, he has acted as such. He knew that his conduct was in direct violation of the law, and that he could not, without being false to his duty as trustee, make such use of trust funds, and his belief in the ultimate success of the speculations in which he embarked could in no wise justify his conduct. In most cases where those who are the custodians of the property of others use it in the furtherance of speculative adventures of their own, they believe that the speculation will be successful, and that no loss will be incurred; but this has never been successfully advanced as a reason for relieving them from any of the legal consequences of their acts. A course of conduct has been shown which solicitors of the Court of Chancery, above all other men, are bound to keep themselves free from. They are in a position of high trust. They are officers of a court especially charged with the supervision and enforcement of trusts, with the protection of the fatherless, and with the righting of wrongs which, though they may not be wrongs within the letter of the law, are against equity and good conscience. The Court of Chancery holds its solicitors up to the world as men possessing the learning and integrity that would justify the confidence that must necessarily be reposed upon them, and they are commonly appointed trustees from the fact that their being solicitors of this court gives them the stamp of trustworthiness and of the special knowledge that marks them as persons in whom confidence may without hesitation be reposed. Happily it is as true now, and within this jurisdiction, as in the time of Sir John Romilly in his, that the Court of Chancery is rarely called upon to bring them to account in this manner.

A father desires by his will to protect his daughters, ignorant of business and unversed in the practical management of affairs, from the dangers that attend improvidence and rashness or credulity and inaptitude in the control and investment of the estate he leaves be-

hind him. His estate is perhaps the accumulation of a lifetime of industry and self-denial, and the principal reward of his life's labors consists in the confidence he feels that, by putting his accumulations in the custody of a trustee to act as their financial safeguard and protector, he will be able to insure his daughters against want while they live, and provide for their children after them. The responsibilities of such a trust are among the most sacred that a man can assume, and upon this court, upon the chancellor, is imposed the duty, the heavy responsibility, of bringing to severe account any solicitor of the court who is clearly shown to have fallen below the standard required of him by the obligations of such a position. It is his duty to see to it that any solicitor who has shown his unfitness for the office of solicitor which he holds, by such maladministration of a trust as is disclosed by the testimony in this case, shall not remain in a situation to do injury to others who might be induced to trust him.

It may be proper for me also to say that, by permitting the respondent to remain a solicitor of this court under such circumstances, I would be wronging his fellow solicitors, and would bring upon them the evil consequences that must certainly ensue from a decision that would amount to nothing less than a judicial determination that such administration of a trust as has been disclosed in this case is not inconsistent with the duties and obligations of a solicitor—is not misconduct that should deprive a solicitor of his office and its attendant privileges. A new standard would thus be established for the officers of this court.

Painful as the duty is, I am constrained to make the rule absolute, and order that the name of James H. Hoffecker, Jr., be struck from the rolls of the Court of Chancery.