(No. 32288.—

IN RE JAY I. ROSENBERG, Attorney, Respondent.

*Opinion filed January 22, 1953.*

CHARLES LEVITON, of Chicago, *amicus curiae.*

JAMES ELWYN DANIELS, of Chicago, for respondent.

Mr. JUSTICE DAILY delivered the opinion of the court:

We consider here a report filed by the board of managers and committee on grievances of the Chicago Bar Association, as commissioners of this court under Rule 59, recommending that the respondent, Jay I. Rosenberg, be disbarred and his name stricken from the roll of attorneys, for unprofessional, unethical and dishonorable conduct. Respondent has filed exceptions to the report and the cause is submitted on the report and the exceptions.

Respondent was admitted to the practice of law in December, 1931, under the name of Joseph I. Rosenberg, and, except for periods when he was engaged in a defense occupation during World War II, pursued his profession in the city of Chicago until 1950. From his testimony in this cause, we gather that he then ceased to practice law and that he is presently engaged in the business of selling photographic equipment. An investigation into his professional conduct was commenced as the result of complaints filed against him in 1949. By one, referred to as the Futterman claim, he was charged with having converted the sum of $5800 which belonged to his client, Nathan Futterman, as successor trustee in various foreclosure proceedings. By a second, known as the Gibson claim, he was charged with having appropriated to his own use a portion of $1303.78 which had been entrusted to him by Minnie and Robert Gibson for distribution to specifically designated creditors. Restitution was made in the Gibson claim before the hearing, but the Futterman claim remains unpaid. As a result of its investigation, the committee found that in both instances respondent had failed to properly apply the funds entrusted to him and that he had converted them to

his own use. In addition, the committee made a special finding that respondent had given false testimony in the matters under investigation.

Respondent's exceptions, particularly those in regard to the findings on the Futterman claim, necessitate a rather detailed recital of the facts. It is undisputed that in 1938, the firm of Rosenberg & Goldman, in which respondent was a partner, became the attorneys for Nathan L. Futterman, who had been appointed successor trustee in various foreclosure proceedings in Chicago courts. At the time the firm was engaged in prosecuting the foreclosures to completion and in addition were members of a syndicate which had purchased from a defunct bank a portion of certain bonds which were secured by the properties being foreclosed upon. There is some conflict as to what person or persons caused Futterman to be appointed but it is quite apparent that he was a figurehead who did the bidding of his attorneys and took no active part in the administration of the trusts with which he was charged. From time to time Futterman, in his capacity as successor trustee, received checks from court officers representing funds which were to be distributed to nondepositing bondholders. At respondent's direction Futterman endorsed the checks to the firm of Rosenberg & Goldman and they were deposited in the firm account with no attempt at segregation. When a bondholder appeared for payment of his claim he was referred to respondent's firm and paid with a firm check. Respondent readily admits the receipt of the funds and the purpose for which they were received and does not contest that there is still a sum of $5800 which has not been distributed and for which the remaining nondepositing bondholders have made no demand.

The normal procedure of paying claimants by a check drawn on respondent's firm ceased when involuntary bankruptcy proceedings were filed against him personally in September, 1941, and against the law partnership of Rosen-

berg & Goldman in November, 1941. The firm was adjudicated bankrupt in July, 1942, and while Futterman's claim for the funds entrusted to the firm was allowed, little of it was paid. It was brought out by a witness before the grievance committee that respondent testified at the bankruptcy proceedings that the funds received from Futterman had been used to pay bondholders and "for the benefit of the firm in their various interests even to the extent of buying a building or two." No denial or objection was made by respondent. The proceeding against respondent individually culminated with an adjudication that he was a bankrupt, but in January, 1944, the adjudication was vacated and the proceedings dismissed. This came about after respondent had executed an affidavit stating that any funds remaining on hand after the dismissal and the payment of costs and fees, should be impressed with a trust in favor of Futterman, as successor trustee, as shown by a proof of claim filed in the proceeding. The affidavit continued with an acknowledgment that the funds were trust funds and that they should be so held for Futterman.

With the advent of the two bankruptcy proceedings various nondepositing bondholders appeared and sought payment of their claims from Futterman, and in a number of instances he was forced to make payment from his personal funds to escape punitive action. Futterman testified that his efforts to contact respondent during this period and to get an accounting were ignored and were unavailing. For his part, respondent denied that he ever avoided Futterman, that he had ever refused to account, or that any bondholder, who made claim, was not paid. Respondent's difficulties and their adverse effect on Futterman caused the latter to retain other counsel and, as a result, attorney Edward A. Gorenstein filed a suit in the circuit court of Cook County in Futterman's behalf, by which it was sought to recover the funds Futterman had entrusted to the partnership. Early in 1946, when the cause came on for hearing,

respondent entered into an agreement with Futterman whereby he again acknowledged the receipt of trust funds and the purpose to which they were to be applied. Further, respondent agreed to indemnify Futterman from any further claims by depositing $2000 with Gorenstein with which to pay claims and stipulated that whenever the fund fell below $500, he would make a further deposit to restore the fund to $2000. It was further agreed that the lawsuit would be continued generally and that the court would retain jurisdiction to determine controversies between the parties and to exercise supervision to the end that claims of bondholders and creditors would be paid. At the time, respondent's admitted indebtedness to Futterman, the successor trustee, was approximately $11,000. In June, 1948, the fund held by Gorenstein fell below $500 and respondent's promises to make further deposits were not fulfilled. The matter was taken before the circuit court again in April, 1949, at which time respondent admitted at a pretrial conference that he still owed $7000 and made a promise to raise a substantial amount of that sum within six months. At the time of the hearings before the grievance committee in 1950, respondent had reduced the indebtedness to $5800 and the suit in the circuit court was still pending.

The facts related show that respondent has frequently and consistently acknowledged the receipt of funds from Futterman, that they were trust funds to be distributed to nondepositing bondholders and that he, respondent, had no personal interest in them. These acknowledgments were repeated before the grievance committee. The record also reflects, without question, that when the bankruptcy proceedings were terminated, there was a shortage of approximately $11,000 in the funds which had been entrusted to respondent and his partner by Futterman. The only straightforward explanation of what happened to the money is respondent's admission in the bankruptcy hearing, that "it had been used for firm purposes even to the extent of buy-

ing a building or two." Before the committee, respondent first testified that he presently had the remainder of the money in his possession and that he felt he was entitled to it. However, he does not show with any clarity by what theory, if any there is, he claims ownership. Later, he stated that the money had never come into his possession and that bondholders paid subsequent to the bankruptcy proceedings had been paid out of his personal funds. In the brief and argument filed in this court respondent again assumes the role of having the funds in his possession, for he says that the "balance on hand" has not been turned over to Futterman because he is awaiting an adjudication by the circuit court. Yet, on oral argument, respondent's counsel admitted that the trust funds had been dissipated when respondent's firm overreached itself in making investments. Weighing respondent's contradictory statements against the entire record, and particularly the evidence of financial condition reflected in the bankruptcy proceedings, we believe that it emerges clearly that the trust funds for payment of the nondepositing bondholders were not properly applied to the purpose for which they were received, but were misapplied for respondent's own personal use and gain.

Seeking to avoid disbarment, respondent makes varied contentions. First, he claims that there is no showing of a conversion or intent to convert on his part, and thus no guilt of moral turpitude, but only that the loss of the Futterman funds occurred as a result of financial difficulties of his law firm. He reasons that this was a partnership matter for which he should not be disciplined as an individual. Respondent does not plead any special equities or defenses against his partner and the record is replete with admissions that he had knowledge of the firm's misappropriation of the trust funds. Such guilty knowledge of a partner, in the absence of any attempt to prevent or correct the misappropriation, is sufficient to merit disciplinary action. (See 5 Am. Jur., Attorneys at Law, sec. 270.) In addition, it

has long been the rule that financial misfortune and adverse circumstances afford no justification for an attorney to convert funds placed in his hands for a specific purpose. *In re Zahn,* 356 Ill. 283; *People ex rel. Chicago Bar Assn.* v. *Grusd,* 318 Ill. 44; *People ex rel. Marion County Bar Assn.* v. *Holt,* 279 Ill. 107.

Secondly, respondent seeks to mitigate the charge against him by pointing out that since the bankruptcy proceeding he has reduced the firm's indebtedness to the trust fund from approximately $11,000 to $5800, and that all bondholders who have presented their bonds have been paid. This is but another way of saying that respondent has made and continues to make restitution of the funds wrongfully converted. While restitution may have the effect of lessening respondent's civil liability, it does not purge him of his offense nor does it prove that he has become a fit person to remain on the rolls, for the fact remains that he deliberately diverted funds, entrusted by a client for a specific purpose, to his own use and benefit. An intention to repay or the replacement of funds diverted do not render the conversion less fraudulent, nor will the fact that a settlement has been made preclude an inquiry into the moral and professional quality of the attorney's acts prior to and in connection with such settlement. *In re Koptik,* 406 Ill. 141; *People ex rel. Wayman* v. *Chamberlain,* 242 Ill. 260.

Finally, stating that the commissioners have acted prematurely, respondent represents that the issue raised by Futterman's complaint to the bar association is identical with the issue created by the pleadings filed in the circuit court, namely, whether respondent had a right to persist in continuing to act as disbursing agent rather than turning the funds back to Futterman. We do not so interpret the report filed here. Such an argument reverts to the premise that respondent received and still has the trust funds in his possession, which, despite the web of confusion created by respondent's admissions, denials, recantations and rationali-

zations, is proved by the record to be a new idea that is entirely false. The committee was called upon to determine if respondent had wrongfully converted the trust funds which had been entrusted to him and his firm for a specific purpose, and it was demonstrated, to their satisfaction and to ours, by respondent's own testimony in the bankruptcy proceedings, that the funds had been misapplied for respondent's own benefit by diverting them for purposes of the law firm of which he was the senior member. The issue of his civil liability, and the theories by which he seeks to avoid it, can do nothing to alter his proved professional misconduct.

In oral argument, respondent's counsel expressed the thought that respondent should not be proceeded against on the Futterman matter, because of the length of time elapsing before a formal complaint was filed. We believe the delay is excusable and that the complaint was filed in a reasonable time in view of the fact that the complainant was forestalled from acting, first, by the prolonged bankruptcy proceedings, then by the delays occasioned by respondent's promises and efforts at restitution.

The facts relating to the second complaint investigated by the commissioners show that on November 17, 1948, Robert D. Gibson and his wife, Minnie, gave respondent a check for $1303.78, payable to their order, and in turn respondent executed a receipt acknowledging that he was to use the proceeds to pay a list of bills which totalled about $900, and that the balance was to be left in account and used for a down payment on repair work contemplated on a building owned by the Gibsons. Some six months later approximately $500 of the money was undisbursed, several of the bills listed on respondent's receipt had not yet been paid, and respondent had given a check of $66.75 in payment of one of the bills which was returned with the notation that the account was closed. When repeated calls upon respondent produced only unfulfilled promises that the bal-

ance of the bills would be paid, Mrs. Gibson made a complaint to the bar association. When testifying before the commissioners, respondent stated that he had opened an account in the Chicago National Bank with the $1303.78 check immediately after its receipt from the Gibsons. He was impeached in this by the bank records which indicated that the account had been opened with a deposit of $250 and that the maximum amount ever maintained in the account was $738.02, about a month after it was opened. In explaining the check for $66.75 which he issued on January 18, 1949, and which was returned marked "account closed," respondent testified that he had closed the account because of disagreements between the Gibsons 'as to what bills should be paid and that he always had enough money to pay the claims. These statements are likewise contradicted by the bank records which show that when the check of January 18 was issued there was only $15.67 in the account and on the following day all that remained was 19 cents. Following Mrs. Gibson's complaint, respondent made restitution by paying approximately $500 to various of the Gibson creditors and by making cash advances to Mr. Gibson. In doing this he claims to have paid out approximately $175 more than the Gibsons had given him.

The commissioners interpreted these facts, and we believe correctly so, as showing that respondent had converted to his own use approximately $500 of the funds which had been given him for a specific purpose and had made no restitution until Mrs. Gibson filed her complaint. Respondent seeks to defend that the specific purpose was changed from time to time by directions from Robert Gibson who, for reasons which need not be fully explained here, he deemed to be his only client in the matter. Regardless of who was his client or clients, the record shows that the bills allegedly paid at Robert Gibson's direction were not paid until long after they were due and not until after the complaint had been made against respondent. When his delay

and promises to Mrs. Gibson are considered in the light of the concrete evidence reflected by the bank records, the only conclusion which can follow is that respondent diverted the funds he received to other purposes, then resorted to dilatory tactics to gain time to make restitution.

Cleared of all immaterial matters, the facts in this case come down simply to the matter that respondent, in two separate instances, diverted funds of clients, received for specific purposes, to his own personal use and benefit. The wrongful conversion by an attorney of funds placed in his hands for a specific purpose involves moral turpitude and is a flagrant violation of the duties of an attorney sufficient to warrant disbarment. (*In re Yablunky,* 407 Ill. 111; *In re Rieger,* 402 Ill. 483; *In re Both,* 376 Ill. 177.) Though not a part of the charges brought against respondent, we cannot ignore that he testified falsely in the matters under investigation, for it demonstrates a further and serious unfitness to practice law. (*In re Sanitary District Attorneys,* 351 Ill. 206; *In re Piszatowski,* 370 Ill. 375.) A license granted by this court to practice is a guaranty that, as far as this court is advised, the person holding such license is a fit person to assume the responsibility of safe-keeping the confidence of others while aiding and assisting them in their legal and business affairs. From a careful consideration of the record before us, we are of the opinion that respondent has, by his conduct, forfeited his fitness and breached his license to continue as an officer of this court.

The report and recommendation of the commissioners are affirmed. The respondent, Jay I. Rosenberg, who was licensed under the name of Joseph I. Rosenberg, is disbarred from the practice of law, and his name is ordered stricken from the roll of attorneys of this court.

*Respondent disbarred.*