In the Matter of WILLIAM H. BENNETHUM.

*(May* 26, 1960.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*David B. Coxe, Jr.* (of Coxe, Booker, Walls and Cobin) for William H. Bennethum.

*S. Samuel Arsht* (of Morris, Nichols, Arsht and Tunnell) for the Censor Committee.

Supreme Court of the State of Delaware, No. 4, 1960.

SOUTHERLAND, C. J.:

This is a disciplinary proceeding against the respondent, William H. Bennethum, a member of the bar of this Court.

The Censor Committee of the Court, pursuant to our direction, held hearings upon several charges of unprofessional conduct. It has filed its report. The Committee finds the respondent guilty of misconduct in three matters and recommends discipli-

nary action. The respondent excepts to the Committee's findings and conclusions.

■ A preliminary question is raised by counsel for the Committee. He contends that Bennethum has waived his right to file with this Court exceptions to the report because he failed to file any exceptions with the Censor Committee. This objection we pass over. We do not wish to deal with serious charges against a member of the bar in such a summary fashion.

The three matters in respect of which respondent was adjudged guilty of misconduct are these:

1. Failure to file State income tax returns and pay the tax.

2. Failure to file Federal income tax returns and pay the tax.

3. Borrowing money from a client without security during the attorney-client relationship.

### 1. State Income Taxes

William H. Bennethum has been a member of this bar in active practice for twenty-nine years. For some years prior to 1951 he held the office of Deputy Attorney General for the State Tax Department.

For the years 1942 to 1949 inclusive all of his income tax returns were filed late. Three of them were filed more than two years late, and two of them more than one year late.

For the six years 1950-1955 Bennethum filed no returns. On January 18, 1956, the State Tax Department made an assessment of $3,233.16 for taxes in respect of the years 1950-1954. Thereafter, the Department discovered additional income and will make (or has made) a revised assessment.

At the time of his hearing before the Censor Committee on November 2, 1959 Bennethum had not paid any part of this amount. After the hearing he paid $2,000 on account.

In 1957 Bennethum was indicted for failure to file a State income tax return and for failure to pay tax in respect of the taxable year 1955, but the indictment was held to be defective. *Bennethum v. Superior Court, Del.*, 153 *A.* 2d 200.

## 2. Federal Tax Returns

During the years 1942 to 1954 inclusive Bennethum was in receipt of income sufficient to require him to file federal tax returns. Prior to 1947 he was an employed associate of a Wilmington law firm and also received a salary from the State during all of these years except one. In 1947 he became a partner. His income from the partnership from 1947 to 1954 ranged from $11,000 to $16,000 annually.

According to the records of the District Director of Internal Revenue, Bennethum filed no return and paid no tax for any of the years 1942 to 1954. A subsequent computation showed a tax liability for the years 1945-1954 of $22,831, exclusive of penalties.

Sometime in 1955 the Internal Revenue Service began an investigation of Bennethum's income tax liability. On October 13 the District Director wrote him about the matter. On November 9 an agent called Bennethum on the telephone and inquired whether he had filed a return for 1954, and Bennethum replied in the affirmative. According to the agent, Bennethum said that he had paid the tax by check. Bennethum later denied having made that statement. According to the agent Bennethum, at the agent's request, agreed to produce the check and said that he would call back. He did not call back.

In December, 1955, two agents called to see him and he showed them papers which he stated were copies of his returns for the years 1952, 1953, and 1954.

On June 15, 1956, the Intelligence Division formally advised Bennethum that its investigation indicated that he had

failed to file returns for the five years 1950-1954, and that consideration was being given to possible criminal proceedings. An opportunity for a conference was afforded. The conference was held July 18. Bennethum was questioned under oath. He testified that he had filed an income tax return with the Wilmington office for each of the years 1942 to 1949.

On March 8, 1957, Bennethum was indicted in the United States District Court for failure to file returns for the years 1953 and 1954. His trial took place in December of that year before a judge without a jury. The Government witnesses testified that the files of the Internal Revenue Service at Wilmington contained no record of any return for any of the years 1942-1954, and no record of any payment of tax. Bennethum testified he had filed returns for 1953 and 1954 and that the copies given to the agents were correct copies of the filed returns. He also relied on the fact that for the years in question he had signed the partnership information returns, which disclosed that he had received income from the partnership.

Judge Grimm in delivering his verdict said that he had a reasonable doubt of guilt. The grounds for his decision will be hereafter considered. The criminal trial dealt only with wilful failure to file returns for the two years 1953-1954. There is before us, however, the question whether he failed to file for the 13 years 1942-1954, and the far more serious questions whether Bennethum's testimony in the case, his sworn statements to the agents, and his testimony before the Censor Committee were false, and whether the purported copies of tax returns for those two years were fabricated.

### 3. The Michener Transaction

This episode involved an unsecured loan of $5,000 made to Bennethum by a client on March 1, 1951, during the existence of the attorney-client relationship. There is also involved the sale of two automobiles by the same client and the giving of

credit for repairs. Neither the loan nor the other items were ever paid.

We agree with the Censor Committee's findings and conclusions to the effect that the transactions were unethical. But in the light of our conclusions with respect to the far more serious offenses, it is unnecessary to consider the matter further, except to say that the transactions are additional proof that Bennethum was in the early 1950's in financial straits.

The gravest question before us concerns Bennethum's conduct with respect to charges of failure to file federal income tax returns.

He testified under oath on three occasions that he filed such returns—before the investigating agents, before the District Court, and before the Censor Committee. The inquiry in the District Court was almost wholly limited to the two years 1953-1954, but he told the investigators and he told the Censor Committee that he filed returns for each year of the period 1942-1954.

Bennethum further testified that during the period 1942-1947 he paid his federal taxes by check, and that from 1947-1952 he paid them in cash.

With the exception of the years 1952-1954 Bennethum produced no written evidence of any sort to substantiate his story —no copies of any returns, no cancelled checks, and no receipts for the payment of cash.

As above stated, according to the records of the District Director of Internal Revenue, Bennethum at the time of his trial had not filed any return or paid any tax for the years 1942-1954. An effort was made to show that the returns might have been lost. The facts show that such an explanation is so wildly improbable that it must be instantly rejected. Upon receipt of a tax return a file card is written in quintuplicate. One copy is placed in an index file. This file is the principal file that

is examined in order thereafter to locate the return. There is one file for each year. Hence to credit Bennethum's testimony, we must believe that all of his index cards were removed, or misfiled, or lost from *thirteen* separate index files. The District Director testified that in 35 years of experience he knew of only two lost returns, and in those cases the index cards had not been lost.

But this is not all. In cases in which the tax is not paid with the return and hence is owing (as was true in respect of several years, according to Bennethum), another copy of the index card, showing the tax due, is filed in an account file and a copy is sent to the taxpayer. Employees of the District Director testified that a search disclosed no record of tax accounts with Bennethum, and no record of any tax payments. Hence, if Bennethum's testimony is to be believed, another series of index cards was lost.

Bennethum's attempts to explain his lack of any written evidence in support of his story are wholly unconvincing. He said that in response to a call from a federal agent in the summer of 1955 he got out his tax files and placed them on a window sill and forgot about them. At about that time, he said, the firm was destroying "dead files" in a storage room. He threw out the suggestion that his tax files may have got into the storage room and been destroyed.

His failure to produce any cancelled checks showing payment of federal tax is unexplained.

His statement to the agents in the 1956 conference respecting payments of tax in cash is likewise unconvincing. He said that after he became a partner he started accumulating cash in a desk drawer, later depositing it in a safe. From this, he said, he made periodic payments on his tax liability. It is to be noted that during the years since he became a partner his tax liability was substantial. Why he chose this unusual method of paying the tax he did not explain. And it seems highly unlikely that

any practicing lawyer would accumulate substantial amounts of cash in a desk drawer.

From the facts above set forth the Censor Committee concluded that Bennethum's testimony that he filed federal tax returns for the thirteen years in question could not be believed. We agree. The story is wholly incredible. Its untruthfulness is emphasized by the production of the papers purporting to be copies of his federal income tax returns for the years 1952-1954.

As above stated, Bennethum in December 1955 produced and delivered these papers to the investigating agents. In the 1956 conference he testified, as heretofore mentioned, about the loss of his tax files. As to the 1952-1954 copies he said that they "got segregated somehow" and that he found them "in another active file, through sheer circumstances [by chance?] which happened to be my mother's file." He added that these copies probably got in this file because he was gathering information "looking forward to filing her return". The connection between information in his own returns and the preparation of his mother's return is not apparent.

The purported copies of the returns for 1953 and 1954 were put in evidence at his trial. They were submitted to the Censor Committee and are before us. They are carbon copies, written in longhand. They show, in addition to income from his law firm, "income from Brandywine Liquors Inc." of $600. Under the heading "Income Tax Withheld" he entered "None", although the federal withholding tax was in force and Bennethum must have received the so-called "W-2" form informing him of the amount withheld. Questioned about the W-2 form he said that he did not remember whether he received it. Asked why he did not deduct the tax withheld, he said he must have cheated himself.

No attempt was made to list deductions from gross income, and the standard deduction of $1,000 was taken.

Asked at the trial why he did not have the return typed, he said that it annoyed the girls to do personal work. Once again, the explanation is wholly unconvincing.

Finally each of the two alleged returns shows a calculation of the self-employment tax, although that tax was not effective until 1955. His explanation was that the matter of self-employment tax upon lawyers had been talked about before the law became effective, and that he didn't take the trouble to check the matter. It is a reasonable inference that the returns were not prepared until 1955.

Based upon all these facts the Committee refused to believe that the papers produced by Bennethum were actually copies of returns made and filed at the times they purported to show. Again, we agree. The story is incredible. As we have said, the Government satisfactorily proved that no return was filed for any year during the period 1942-1954, and Bennethum's attempts at explanation are incredible. All of the circumstances show, as the Committee found, that the purported copies were fabricated in an attempt to fend off impending charges.

This Court takes a most serious view of this deplorable record of misconduct. It is bad enough for a lawyer to violate the law requiring him to file income tax returns. In this case Bennethum admittedly violated the State law by failing to file returns during the six years 1950-1955. His excuse was that he did not have the money to make payment, and that he had some understanding about this with a representative of the State Tax Department, since deceased. As the Committee says, our income tax system is based in great part upon voluntary compliance with the law. The lawyer who disregards his duty as a citizen in this respect fails to uphold the standards of his profession. For such disregard of law attorneys have consistently been disciplined by the courts, usually by suspension. See the cases collected in the annotation in 59 *A. L. R.* 2d 1398.

But far more serious, in our view, is the reprehensible conduct with respect to the federal returns. Not only did Bennethum fail to file them, as we have found, but he has aggravated his misconduct by giving false testimony and fabricating evidence. What can be said in his defense?

His counsel, who has ably represented him before us, makes the following argument:

The misconduct here charged consists of violations of criminal statutes not connected with the practice of law. In such a case the general rule is that a conviction of the crime is a prerequisite to disciplinary action. Conceding that there is an exception to the rule if moral unfitness to practice law clearly appears, yet in the instant case no moral turpitude is evidenced by proof of tax evasion, and the respondent has been acquitted of the charge of wilful failure to file federal returns for the years 1953-1954. As to the Committee's finding of failure to file federal returns for the entire 13 years, it is said that the evidence is inconclusive.

 It is unnecessary to examine the cases dealing with discipline of attorneys for violations of the criminal law not connected with the practice of law. Counsel concedes that in certain circumstances a conviction is not a prerequisite to discipline. It has been so held in this State. *In re Hoffecker, Del. Ch.* 1905, 60 *A.* 981. In that case an attorney was disbarred for misconduct as a trustee. See also *Ex parte Wall,* 107 *U. S.* 265, 2 *S. Ct.* 569, 27 *L. Ed.* 552. The question is whether the facts proved justify the finding of moral unfitness to practice law. Here the Committee's findings of fact, which we uphold, are that the respondent's testimony that he filed his federal returns was false, and that the written evidence submitted for the years 1953 and 1954 was fabricated. Such conduct has been repeatedly held to constitute evidence of moral unfitness to practice the profession, and to require disbarment, even though the offense was not committed in the practice of law. If the facts are clear, no prior

conviction of false swearing is a prerequisite to disciplinary action. See the following cases: *In re Ulmer, D. C. Ohio,* 208 *F.* 461; *In re Percy,* 36 *N. Y.* 651; *Perry v. State,* 3 *G. Greene, Iowa,* 550; *Ryan v. Opdyke,* 143 *N. Y.* 528, 38 *N. E.* 963; *In re Popper,* 193 *App. Div.* 505, 184 *N. Y. S.* 406; *In re Eaton,* 14 *Ill.* 2d 338, 152 *N. E.* 2d 850; *In re Rosenberg,* 413 *Ill.* 567, 110 *N. E.* 2d 186; *In re Hertz,* 169 *Minn.* 431, 211 *N. W.* 678; *In re Cary,* 146 *Minn.* 80, 177 *N. W.* 801, 9 *A. L. R.* 1272.

But it is said in the instant case the facts are not clear, but in dispute, since respondent denied them, and especially since he was acquitted in the District Court upon the charge relating to the years 1953-1954. As to the remaining years, it is said, the evidence is insufficient to establish non-filing.

As to the conflict in the testimony, and the insufficiency of proof of non-filing, it is enough to say that we have already dealt with the matter. In our opinion Bennethum's denial is, for the reasons above set forth, not only entitled to no weight but it greatly aggravates the offense.

As to the acquittal in the District Court special comment is required.

We do not think that respondent's acquittal is sufficient to lessen to any substantial degree the force of the conclusions above stated, for the following reasons:

First, the only years involved in the criminal trial were the years 1953 and 1954. True, the Government introduced evidence of non-filing for the entire 13 years, but it appears from a reading of the comments of the trial judge that he had serious doubt whether he might properly consider the facts concerning the prior years. Thus the trial judge remarked that perhaps the Revenue Service did make a mistake for 1953 and 1954, but asked: "How can it be believed that it made a mistake from 1942 all the way down to 1954?" No answer was forthcoming, and the judge added: "* * * but not all these years, but that

goes back to the question of whether I can consider all those other years." He further said that if the evidence of the other years was admissible, the Government had certainly proved that no returns were filed in 1953 and 1954, but that was something he would have to keep thinking about. Cross examination of the respondent with respect to the prior years was excluded.

Second, it will be recalled that Bennethum, as a partner, signed the partnership information returns for 1953 and 1954. At the conclusion of the trial the judge informed counsel that he desired briefs on two points: (1) whether he could consider the prior years; (2) whether or not the partnership return "does not almost by itself require a verdict of acquittal." Previous colloquies between court and counsel indicate that the court attributed great weight to the signing of the information returns by Bennethum as rebutting wilfulness in respect of the two years 1953 and 1954.

Finally, in delivering his judgment the trial judge stated that he had a reasonable doubt of guilt, and then commented on the effect of his decision as creating a precedent that "partners can file partnership returns and there will be no criminal liability thereafter."

It seems a reasonable inference, therefore, that the principal finding in the criminal trial was that Bennethum's signing of the partnership returns created a reasonable doubt whether the failure to file in 1953 and 1954 was wilful.

██ Such a finding must, of course, have been predicated upon an assumption, at least, that no returns were filed for the two years in question. If the court believed Bennethum's testimony respecting his returns for these years, no further inquiry into the matter was required. The verdict, therefore, cannot be taken as establishing the truth of Bennethum's testimony. We are at liberty, in this proceeding, to consider it afresh. And we are not limited by the strict rules surrounding a criminal trial, either as to the quantum of proof (*In re Morford*, 7 *Terry*

(46 *Del.*) 144, 80 *A.* 2d 429), or by the rule excluding proof of similar offenses in criminal cases.

So considering it, we find it, for the reasons already set forth at length, to be false.

It is this circumstance that markedly distinguishes this case from the two other recent cases involving charges of federal income tax violation against two other members of this bar. In one the defendant admitted not filing, but defended on the ground that the omission was not wilful, but attributable to press of circumstances. This defense was accepted by the jury, and he was acquitted. His tax liability, it appears, was settled and discharged. No disciplinary action was deemed to be required.

In the other case the defendant frankly admitted his fault, pleaded *nolo contendere*, threw himself upon the mercy of the court, and paid the taxes due, with interest and penalties. A small fine was the extent of the punishment. Because of these circumstances, and others, including his age and health, we again felt that no action by this Court was called for.

This case is wholly different.

Before pronouncing judgment, we must advert to one other circumstance. The Censor Committee, in formulating its charges and in recommending discipline, did not formally charge the respondent with the offense of false swearing. But it did find the facts, and to those findings the respondent has excepted. The issue was necessarily before the Committee, as it is before us. Indeed, the questions put to the respondent by the members of the Committee reveal clearly, as the respondent must have known, that the truth of his testimony was in issue. In these circumstances, the absence of a formal charge of false swearing does not preclude the Court from acting upon the facts proved. See *In re Eaton* and *In re Rosenberg*, above cited.

Only one conclusion, we think, is possible in the circumstances of this case. The respondent's conduct has been such as

to show his moral unfitness to continue in the practice of law. In the case of *In re Percy, supra,* New York Court of Appeals, rejecting the contention that misconduct, to justify disbarment, must consist of some act committed in the exercise of the profession, said:

"It is true that to warrant a removal the character must be bad in such respects as shows the party unsafe and unfit to be intrusted with the powers of the profession. There are many vices, that render the character more or less bad, that have no such tendency. But a want of credibility upon oath does not come within this class. When there can be no reliance upon the word or oath of a party, he is, manifestly, disqualified, and, when such fact satisfactorily appears, the court not only have the power, but it is their duty to strike the party from the roll of attorneys."

This is an especially distressing case. So far as we know the respondent has not at any time heretofore been suspected of any wrongdoing whatever. His professional record has been excellent. But the misconduct proved in this case is shocking. It cannot be condoned.

It is to be remembered that the purpose of disciplinary action is not primarily punishment. It is the performance of the imperative duty of the courts and of the bar itself to protect the public against the lawyer who has proved himself unfit to practice his profession.

Reluctantly, we are compelled to conclude that this duty requires the extreme discipline of disbarment.

An order will be entered striking the name of the respondent from the roll of attorneys of this Court.

1. ATTORNEY AND CLIENT.

Where transcript of testimony in federal criminal case against attorney and a large number of exhibits were put in evidence before the Censor Committee without objection by the attorney, and the disciplinary proceeding came to the Supreme Court by way of the attorney's exceptions to the Commitee's

findings and conclusions, the attorney could not invoke the rule that the record in the federal case was admissible only to prove the giving of the testimony and not to prove perjury.

2. ATTORNEY AND CLIENT.

In disciplinary proceeding, record failed to show that too much weight was given to the fact of the erroneous reporting of the employment tax in connection with the finding that the attorney's tax returns for 1953 and 1954 were fabricated.

PER CURIAM.

Counsel for respondent argues that the only evidence on which this Court made the finding of false swearing is the evidence presented in the federal criminal trial. Authority is cited for the proposition that the record of the case in which the perjured testimony was given is admissible only to prove the giving of the testimony and not to prove perjury. 70 *C. J. S.* Perjury § 59, p. 530.

The argument overlooks the fact that the transcript of the testimony in the federal case, and a large number of exhibits, were put in evidence before the Censor Committee, without objection by respondent. The rule cited is inapplicable.

Counsel argues that the Censor Committee and this Court gave too much weight to the fact of the erroneous reporting of the employment tax in connection with the finding that the tax returns for 1953 and 1954 were fabricated. We do not think so, but even if the respondent were given the benefit of the doubt in this respect, the weight of the other evidence sustaining the finding would be unaffected.

Counsel's last point we have difficulty in understanding. Counsel appear to suggest that the Court has been "deprived of evidence" respecting the practice at the Wilmington office of the Internal Revenue Service, which might explain the absence of any records, despite payment of his taxes by respondent.

Counsel does not suggest what this evidence is, nor is any explanation offered why it was not adduced either at the federal

trial or before the Censor Committee. The respondent had two opportunities to present it. Before the Committee the respondent expressly stated that he would stand upon the record in the federal case. We can hardly believe that if this new evidence had been of any substantial help to him he would not have offered it at the proper time.

Finally, counsel suggest that some measure of discipline short of disbarment might be justified. Lesser discipline was, of course, given consideration; the Court reached its conclusion only after long and careful thought, and very reluctantly. But we found no escape from it, and see no reason to change it.

The petition for reargument is denied.