# IN THE MATTER OF THE APPLICATION FOR THE REMOVAL OF FRANCIS C. CARY, AN ATTORNEY AT LAW.[1]

June 4, 1920.

No. 21,762.

**Bad faith of attorney.**

1. The evidence sustains the charges that the accused attorney at law wilfully made false and fraudulent representations to a legislative committee with reference to his pecuniary interest in certain bills then being considered by the committee, and also that he obtained from the beneficiaries named in said bills agreements to pay such exorbitant compensation for the services he was to render in securing their passage as to show him guilty of dishonesty and bad faith towards his clients.

**Dismissal of attorney from the bar for moral unfitness.**

2. Misconduct indicative of moral unfitness for the profession, whether it be professional or nonprofessional, justifies dismissal as well as exclusion from the bar.

Vernon C. Pidgeon, secretary of the state board of law examiners, petitioned the supreme court for the disbarment of Francis C. Cary, because of his unprofessional conduct as an attorney at law. The facts are stated in the opinion. Respondent removed, and formal judgment of disbarment ordered.

*J. D. Sullivan* and *V. C. Pidgeon*, for petitioner.

*C. D. O'Brien*, for defendant.

PER CURIAM.

The secretary of the state board of law examiners presented a petition to this court accusing Francis C. Cary, an attorney at law duly admitted to practice in this state, of unprofessional conduct in this: (1) That during the 1919 general session of the legislature he appeared before the Committee on Finance of the Senate advocating favorable action upon four bills, then under consideration by the committee, appropriating money to certain persons, and falsely and deceitfully represented

[1]Reported in 177 N. W. 801.

to the members of said committee that neither he nor any one connected with his law firm had any pecuniary interest in the money to be appropriated, when as a matter of fact he then had an agreement with each of the four beneficiaries in said bills whereby he was to receive one-half of any money appropriated, and that his conduct toward the committee was wilfully deceitful and unprofessional; (2) that the compensation exacted from the beneficiaries was so unreasonably large that it amounted to dishonest and unconscionable conduct towards his clients. In response to an order of this court requiring Francis C. Cary to answer the accusations made in the petition, he appeared and entered the plea of not guilty. Thereupon Honorable Frederick N. Dickson was designated to act for the court in the taking such evidence as might be tendered by the parties, and which he deemed material and pertinent to the issues. The evidence thus taken has been reported to us and the briefs and arguments thereon presented.

1. As to the alleged deception practiced on the Senate committee: The bills referred to in the petition and respondent's connection with them arose in this wise: On October 12, 1918, a frightful forest fire swept over the northeastern part of the state, bringing death, injury and destitution over a wide range of territory, completely wiping out not only farm structures but villages and even cities. The Minnesota Home Guards were called out by the Governor and did heroic relief work. In this service some of its members met death or were seriously injured. Respondent, a major and acting judge advocate in the guards, was on duty at Moose Lake when in November, 1918, he came in contact with Mrs. Colles, whose husband had died while on military duty in this relief service, and he suggested to her that the legislature might be induced to appropriate money for her relief. He also found another widow, Mrs. Vader, in the same situation, and Martin Larson, a member of the guards, who had been seriously injured on duty. These three claims, so-called, were among the office files of respondent, when, in January, 1919, one H. H. Rolfe entered the employ of respondent's law firm as a clerk or "handy man," at a salary or "drawing account" of $100 per month, and extra pay upon any business he might bring the firm. Upon discovering the three claims mentioned in the office files, it occurred to him that one John H. Paulzine, whose son, a member

146 M.—6.

of the guards, contracted death in the relief service, might likewise be entitled to the state's bounty. Through Rolfe's efforts Paulzine came to the office and made a written agreement with respondent, or his law firm, under which the claim was to be presented to the legislature and for the services rendered the compensation should be one-half of whatever sum might be appropriated. Unfortunately the copy of the contract given Paulzine was destroyed by him after he thought it had served its purpose. The duplicate retained in the office files was not produced. Respondent's relation with Mrs. Colles and the agreement with her as to fees appear inferentially but clearly from letters written by him. Some of the letters were signed by him with the name of his law firm, others were signed with his own name appending the letters J. A., standing for judge advocate. Under date of March 3, 1919, he writes her:

"I feel that something ought to be done in your case to hurry along information on which we can base a bill through the legislature. I believe it would be well to make arrangements with a lawyer to undertake this on a commission basis so that he would make it his business to get * * * the bill introduced and push on it until the bill would go through. * * * I have in mind an attorney that we could employ in your behalf who would charge nothing whatever if he doesn't get the bill through, and would charge one-half of whatever was gotten if the bill goes through. I really believe it is the best thing to do and I believe he would get a bill through that would get something for you to help you along. If you feel the same way about it, please write me and I will take the matter up with him and try to get it moving."

On March 15 he wrote among other matters: "We believe you are as deserving as anyone could be of getting relief from the state, and we want to do all we can to help. We have made arrangements with Henry H. Wolfe, a lawyer, who is specializing in this work, to handle the claims on a fifty per cent basis. If he does not succeed he gets no pay whatever, so that you cannot lose anything; if he does get a good allowance for you you will be that much ahead. He has specialized [in] this work and for that reason it is better to pay him in case you win and we

will make arrangements for him to handle it for you with us. He is also a lieutenant in the National Guard and will do everything in his power to get the claim allowed."

We think this correspondence indicates an employment by respondent and that Rolfe's name was only used as a subterfuge to make it easier to obtain the coveted fees. Rolfe absolutely denies that the claim was turned over to him, or that he was employed to handle it. In answer to a letter from Captain Swedberg, the commander of Colles, Vader and Larson, respondent, under date of March 5, 1919, wrote, signing the name of his law firm to the communication:

"Answering your letter of March 4, regarding Pvt. Geo. Vader and Corp. Martin Larson, beg to state that the law firm I am connected with will handle these cases for the interested parties to the best of their ability."

This clearly enough shows that respondent had procured employment from Mrs. Vader and Martin Larson. There was also direct testimony from Mrs. Larson that respondent was employed and that he made the bargain for one-half of what might be secured as fees for his services. Respondent contends that whatever he did in the premises was gratuitous and as an official assisting members of the guards or their dependents, and that Rolfe was the attorney who handled the matters and bargained for and earned the fees. This Rolfe absolutely denies, except that on the Paulzine claim, which he brought into the office, he was to receive one-third of whatever respondent obtained as fees.

We are convinced, and so find the fact to be, that whether or not any of the contracts with the four claimants was made in the name of Rolfe ostensibly, it was for the benefit of respondent, and that respondent was the real party to receive all the fees bargained for with each of said claimants, except that Rolfe was to receive one-third of the fees obtained by respondent in the Paulzine matter. We also find that such was the situation in regard to the arrangement for compensation when respondent appeared before the Senate Committee on Finance as hereinafter stated.

In January, 1919, the legislature convened. Some time, presumably in March, four bills were prepared in respondent's office and under his

direction and supervision on the four claims mentioned, viz.: (1) For the relief of Gertrude Colles for the death of her husband, $2,000; (2) for the relief of John H. Paulzine, on account of the death of his son, $2,000; (3) for the relief of Martin Larson for disabilities suffered, $5,000; (4) for the relief of Mrs. G. Vader for the death of her husband, $2,500. He brought the bills to the Capitol and procured members of the legislature to introduce them in the House and Senate. When they were considered by the Senate Committee on Finance, respondent appeared before the committee urging favorable action. Rolfe was also present and took part. On this occasion different members of the committee questioned respondent very pointedly as to whether he or anyone connected with his firm had any pecuniary interest in the bills. To every one respondent answered that neither he nor anyone connected with his law firm were to receive one cent for their services. Respondent wore a major's uniform and stated to the committee that he was "a dollar-a-year man." Respondent does not now deny that he answered, in effect, as above stated.

We find that respondent made the representations to the committee that neither he nor anyone connected with his law firm had any pecuniary interest in the bills mentioned as charged in the petition, and that such representations were wilfully false and made with intent to deceive the committee.

The bills as introduced were embodied and passed in the general appropriation act (Laws 1919, chapter 464, pp. 578, 579, §§ 39, 40, 41 and 42), for the specific sums named in the bills. Respondent caused the beneficiaries to give Rolfe a power of attorney, and armed therewith the latter procured the auditor's warrants on the treasurer payable to Mrs. Colles, Martin Larson and John H. Paulzine. For some reason, not disclosed by the evidence, Mrs. Vader's warrant was not secured. Rolfe delivered the three warrants mentioned to respondent. He procured the payee's indorsements. One of the warrants respondent deposited to the credit of his individual bank account, and the other two he exchanged for certificates of deposit payable to his own order. Respondent provided the cash by which the payee or clients received their one-half of the amount of the warrants. He sent his stenographer with $1,000 in currency to Moose Lake with instructions to pay it to Mrs.

Colles upon her indorsement of the warrant, which was brought back to respondent. Mr. Paulzine was likewise paid $1,000 in currency at the office by the same stenographer, upon indorsing his warrant which was also received and disposed of by respondent as above stated. Martin Larson died before the warrant was procured or paid. Respondent's law firm secured the-appointment of an administrator for his estate, to whom respondent paid $2,500 in cash, and at the same time informing the administrator that Larson had agreed that the balance was to be retained by respondent for his services, also saying that the expenses were heavy and that Rolfe was to have some compensation out of it. The contention of respondent now is that out of the $4,500 withheld from the beneficiaries named in the bills, $500 only went to respondent's law firm, and that the said sum was not payment for services rendered by him or his firm, but to repay the firm for money advanced Rolfe on his drawing account. In short, that Rolfe received the whole $4,500, but allowed $500 thereof to be applied upon his drawing account. Rolfe positively denies this, and claims that in the whole matter he was employed merely as a clerk by respondent's law firm and did what he was told; that he never received anything out of the several claims, except $200 which respondent gave him out of the fees obtained from Paulzine, with the statement that that amount was one-third of the fees received after deducting the expenses. Respondent has no book entries showing any payment to Rolfe; he has no receipts or other written evidence whatever that Rolfe received any part of the $4,500 traced into the hands of respondent, or any other money from respondent, or from his firm, except small checks issued to Rolfe at various times during the employment, evidently in payment of his salary and for some trifling disbursements made for the firm, and except the $200 which Rolfe says he got upon the Paulzine matter. There is nothing to show that respondent's partner, now dead, received any part of the proceeds. Indeed, respondent testified that his partner never knew that any of these claims were in the office or had any existence until after the bills were passed, that nothing in regard to the claims or proceeds ever appeared on the firm books, and that no services whatever were rendered by his partner to secure the appropriations from the state.

As to his partner's freedom from any connection with either the claims or proceeds, we are willing to accept respondent's testimony.

We find that respondent received and kept for his own use $4,300 of the amounts received upon the warrants issued in payment of the Colles, Paulzine and Larson appropriations.

On the argument it was suggested that respondent's appearance before the Finance Committee of the Senate was not in any legal proceeding and therefore his deceit there cannot come under the designation of unprofessional conduct as an attorney. We cannot adopt the suggestion. In People v. Meyerovitz, 278 Ill. 356, the court said: "The weight of authority holds that misconduct of an attorney outside his professional dealings may afford good ground for disbarment." Such is also the holding in Delano's Case, 58 N. H. 5, 42 Am. Rep. 555; In re Wilson, 79 Kan. 674, 100 Pac. 635, 21 L.R.A.(N.S.) 517, 17 Ann. Cas. 690; Penobscot Bar v. Kimball, 64 Me. 140; In re Radford, 168 Mich. 474, 134 N. W. 472. In re Peck, 88 Conn. 447, 91 Atl. 274, Ann. Cas. 1917B, 227, it was said: "Professional honesty and honor are not to be expected as the accompaniment of dishonesty and dishonor in other relations. So it is that we, in common with other courts, hold, as did Lord Mansfield more than a century ago, that misconduct, indicative of moral unfitness for the profession, whether it be professional or nonprofessional, justifies dismissal as well as exclusion from the bar." The Senate Committee was engaged in important public duties, as respondent well knew, and he undoubtedly also well knew of the practice that obtained with the committee of making provisions in the bill for attorney's fees or other expenses that the state should bear, so that what the legislature meant to give would reach the object of its bounty intact. The motive for respondent's deceit is readily discerned, and the facts above found prove, without further comment, that, if he ever had that good character which entitled him to enter the profession, he has lost it and is no longer worthy to continue therein. Even if there were any truth in his claim that Rolfe was the one who represented the parties named in the bills and received all the fees it would make respondent's conduct and representations just as reprehensible and deceitful. Rolfe was an employee of respondent's law firm, and respondent knew that the agreements for compensation which he claims to have made with Rolfe

were so exorbitant and unconscionable that the committee would at once have taken steps to prevent the exaction.

2. We also have no hesitancy in finding that the fee or compensation which respondent induced his clients to agree to pay was so excessive in comparison with the services in contemplation that it shows dishonesty and bad faith to the clients. There was to be no legal battle, no tedious work in the preparation of a trial in court. It was a mere matter of procuring some affidavits from persons conversant with the facts. And, outside the immediate claimants, such affidavits could no doubt be furnished by the companions in arms of the dead or injured involved in the bills. Under those circumstances to bargain for half of what the state might be willing to give the sufferers seems to us downright robbery, and shows a person of such greed that he ought not to be in a position to bargain for professional fees. By what is here said we do not mean to hold that every bargain for excessive fees by an attorney merits disbarment. In the ordinary litigation there are contingencies that justify large fees. But this particular employment does not come under the head of litigation.

Our conclusion is that the finding hereinbefore made requires that Francis C. Cary be removed from office.

It is ordered that respondent be removed from his office of attorney at law in this state and a formal judgment of disbarment be entered.