## No. 27787

### The People of the State of Colorado v. Niel L. Good

(576 P.2d 1020)

Decided April 3, 1978.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, Edwin L. Felter, Jr., Assistant, for The People of the State of Colorado.

Niel L. Good, pro se.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

The Attorney General filed a complaint with the Grievance Committee of this court against Niel L. Good, respondent, containing five counts of alleged misconduct. The respondent filed an answer to each count. A panel of the Grievance Committee heard the matter and entered its findings, conclusions and recommendations. The respondent filed exceptions. A summary of the findings, together with the contentions of the Attorney General and the respondent with respect to each count of the complaint, is hereinafter set forth:

## I. *The Asmus Matter.*

In June 1975, respondent was retained by Mr. and Mrs. Harold Asmus to obtain a quitclaim deed to an undivided interest in real property from Mrs. Asmus' sister who lived in Oregon. The Asmuses had purchased the outstanding interest at tax sale, and a receipt and option contract had been executed by a purchaser. To insure the title for the purchaser, the title insurance company required the sellers to obtain a quitclaim deed from the sister or to quiet title in the Asmuses.

When the respondent had not been able to obtain the quitclaim deed by August 1975, the Asmuses paid respondent a $500 retainer to quiet title in them. Respondent advised the Asmuses that it would take six months to obtain the decree and another six months would be required by the title insurance company before it could issue its commitment. Based on this assurance, the Asmuses, through their agent, obtained a one-year extension of the receipt and option contract.

Thereupon, the respondent turned the matter over to his partner. Subsequently, on several occasions, the Asmuses or their real estate agent inquired concerning progress of the quiet title action. The respondent, without checking with his partner, assured them that the matter was proceeding normally when, in fact, it had not been filed.

Early in March 1976, the respondent informed Mr. Asmus that since his partner had not filed the action he would file it immediately. On March 21, 1976, Mr. and Mrs. Asmus determined from the Clerk of the District Court that nothing had been filed and made a written demand for the return of the $500 retainer. Following receipt of the demand, the respondent discussed the matter with Mr. Asmus, apologized for the delay, and offered to purchase the property if the Asmuses lost the sale by reason of his procrastination.

A copy of the Asmuses' March 21, 1976, letter was sent to the Colorado Bar Association, which fact appeared on the original which went to the respondent. At about the same time, the Asmuses filed an informal complaint with our Grievance Committee. On March 31, 1976, respondent repaid the Asmuses the $500 retainer by sending them his check with the following endorsement:

"Endorsement hereon constitutes payment in full of refund of fee and a complete release of Niel L. Good and Anthony A. Veto from any and all claims."

The cover letter, in part, stated:

"You will please note restrictive endorsement on the back of the check. You should please read and understand that endorsement prior to negotiating the check."

In the letter the respondent apologized to the Asmuses and offered to complete the quite title action promptly if they changed their minds.

The Hearing Committee found that the evidence was inconclusive as to whether Mr. Asmus discussed the restrictive endorsement with the respondent before he and Mrs. Asmus endorsed and cashed the check. The Asmuses were able to obtain a further extension of the receipt and option contract, did not lose the benefit of the sale, and were damaged only by the delay and inconvenience. The respondent charged nothing for his services, nor the costs advanced in connection with his efforts to obtain the quitclaim deed.

The Hearing Committee found that the respondent violated DR 6-102 of the Code of Professional Responsibility which provides:

"(A)   A lawyer shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice."

The Committee also found that respondent was guilty of unnecessary delay and neglect of a matter entrusted to him in violation of the provisions of DR 6-101(A)(3) and that his statements to his clients regarding progress of the matter were false and misleading in violation of DR 1-102(A)(4) and DR 7-102(A)(5) of the Code of Professional Responsibility. The respondent did not except to these findings. The record clearly supports the Hearing Committee's conclusions.

## II.   *The Johnson Estate Matter.*

In July 1973, respondent was retained by Melinda Cain, granddaughter of Averill C. Johnson, deceased, and the administratrix of his estate, to complete the administration of the estate begun in July 1972 by other counsel. The assets of the estate consisted of cash, bonds, personal property and one piece of real estate. The respondent was paid his fees in full in December 1973. Throughout 1974 and 1975, the administratrix made repeated requests to respondent to close the estate; he repeatedly assured her that the estate would be expeditiously closed.

In the fall of 1975, the administratrix, who lived in Washington, D.C., employed a Washington lawyer for the purpose of compelling the respondent to terminate the estate proceedings. After telephone calls and letters importuning the respondent to take the necessary steps to close the estate and reminding him of an informal complaint to the Grievance Committee filed by the administratrix, the respondent finally closed the estate on January 20, 1977.

The Hearing Committee's conclusion:

"Although there were some delays occasioned by the frequent changes of address and frequent travel by the administratrix the Committee concludes that the respondent neglected a legal matter entrusted to him in violation of the provisions of DR 6-101(A)(3). Failure to conclude a relatively simple estate within a period of approximately three and one-half years is, in the opinion of the Hearing Committee, inexcusable."

The respondent accepted the findings and conclusions as to Count II.

### III.  *The Montgomery Matter.*

On March 8, 1972, William C. Montgomery entered into a written contingent fee contract with the respondent to recover damages for injuries sustained in an automobile accident which occurred in May 1971, in the course of his employment. Montgomery received Workmen's Compensation benefits through Liberty Mutual Insurance Company in the amount of $10,883.95. The insurance company notified Montgomery of its right to subrogation. The contingent fee contract provided that respondent was to receive 25 percent of the amount recovered as a result of a settlement prior to suit, 33-1/3 percent of a settlement prior to or during trial and 50 percent of all proceeds received after an appeal.

An action was filed against Yellow Cab Company. Immediately prior to trial in September 1973, after lengthy negotiations, Yellow Cab Company offered to settle for $50,000. Montgomery accepted the offer. As an inducement to his client to accept the settlement offer, the respondent agreed to reduce his fee from $16,666 to $10,000. Respondent obtained the endorsement of Mr. and Mrs. Montgomery on the settlement check and gave them his personal check for $30,000, retaining $20,000.

A dispute arose between the respondent and his clients, primarily over whether he was to retain $10,000 for his fee or whether, after paying the subrogation claim of Liberty Mutual and the balance of doctor and hospital bills, the remainder would constitute his fee. It was the contention of respondent that he was to attempt to compromise the Liberty Mutual claim, but pay the balance due the doctor and the hospital. To the extent the $10,000 retained for settling these claims fell short of his ability to liquidate the claims, the Montgomerys were to pay. The Montgomerys took the opposite view. The Hearing Committee resolved this issue in favor of the respondent, pointing out, however, that it would have been better practice for him to have put the subsequent fee agreement in writing.

The Montgomerys paid the doctor and hospital bills but did not advise the respondent. Respondent's efforts to compromise failed, and he paid all but $1,271.25 of the subrogation claim in installments of $5,000, $3,000, $1,000 and $612.70. Respondent made the final payment of $612.70 on August 24, 1974. At that time, the respondent advised Liberty Mutual that it would have to look to the Montgomerys for payment of the balance since the total of $9,612.70 represented all of the funds in his hands for payment of their claim. In the meantime, the Montgomerys moved to Nebraska and left no forwarding address with the respondent.

In May 1976, Liberty Mutual sued Mr. Montgomery for the $1,271.25 balance, but ultimately accepted approximately one-half in full settlement of its claim.

The Hearing Committee concluded that the respondent did not segregate the trust funds being held for the use and benefit of the Montgomerys from his regular business account and was, therefore, in violation of DR 9-

102(A). This conclusion is followed by this finding:

"Although he ultimately expended all of those funds on behalf of and for the benefit of the Montgomerys and although there may have been some justification for the piecemeal or periodic payments to Liberty Mutual Insurance Company consistent with the respondent's alleged efforts to compromise its claim, it is the Hearing Committee's opinion that the respondent should have immediately paid all monies being held by him for the use of the Montgomerys to Liberty Mutual Insurance Company when it was determined that a compromise was impossible.

"Furthermore, it is clear from the respondent's bank records that he did not retain the funds of the Montgomerys in a trust account as required by DR 9-102(A). His regular law firm account into which the funds were deposited did not at all times during which the funds were held by the respondent, contain a balance equal to the funds belonging to the Montgomerys; indeed, at one time during said period the account was substantially overdrawn. The Hearing Committee necessarily concludes, therefore, that the respondent used funds held for the use of his clients for his own purposes and could not have, upon demand, at all times, produced such funds. Such conduct warrants substantial discipline."

It is clear from the records introduced by the Attorney General that the $50,000 received from the settlement went into the firm's general business account and that all of the funds paid in connection with the settlement were paid out of the same account.

## IV. *The McGrath Matter.*

McGrath was an electrical contractor. He did electrical work on properties owned by a Mrs. Georgianna Burton in 1972 and Whitteborg Associates in 1974. The accounts, being unpaid and delinquent, were turned over to the respondent for collection. The respondent timely filed mechanic's lien statements against each property.

In connection with the claim against Burton, the respondent filed an action in the district court of Clear Creek County and obtained a default judgment for the amount of the claim. No attempt was made to collect the judgment. The Burton matter was handled under a contingent fee contract. No statement for services was ever submitted to McGrath.

In connection with the Whitteborg claim of $4,800, the respondent, after filing the lien statement, failed to take further action. The property was sold after the lien expired. A dispute existed between McGrath and the respondent as to how this matter was to have been handled. The respondent contends that he refused to proceed on a contingent fee basis, that he requested McGrath to pay a retainer before filing a foreclosure action. Respondent allegedly wrote to McGrath advising him that the Whitteborg lien would expire within approximately two months from the date of the advisement. McGrath claims he did not receive such a letter. In any event, a copy of the alleged letter furnished by the respondent does

not request a retainer or advancement of costs, not does it advise the client of the consequences of the expiration of the lien or what action should be taken to protect McGrath's interest. McGrath testified that the respondent made no demand upon him to advance funds as a condition to protecting his interest in the Whitteborg property.

The Committee concluded that the respondent knew of McGrath's desire to collect the Whitteborg debt and had a responsibility to take steps to protect his client's interest in the mechanic's lien, or to advise his client unequivocally of the necessity for a retainer or other affirmative action by the client directing him to commence the foreclosure action. The Committee concluded also that McGrath would have paid a retainer had he been so requested. Finally, the Committee concluded that the respondent misled his client by assuring him that "everything was being taken care of" when, in fact, no action had been commenced and the statute of limitations had run, such conduct being in violation of DR 1-102(A)(4) and DR 7-102(A)(5).

An attorney who accepts an account for collection is obligated to use his best efforts to pursue that objective to the best result obtainable. DR 6-101(A)(3) provides:
"(A)    A lawyer shall not:

. . . .

"(3)    Neglect a legal matter entrusted to him."
Pertinent to this proposition is DR 7-101, which mandates that a lawyer represent a client zealously. Portions of the rule which are particularly relevant to the McGrath situation provide that:
"(A)    A lawyer shall not intentionally:
"(1)    Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules . . . .
"(2)    Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105."

V.    <em>The Standish Matter.</em>

This count charges the respondent with failing to maintain a separate identifiable bank account for certain funds which he received for the use of his client, Glenn D. Standish, and not paying certain portions of the fund to the client upon demand. Also involved in the problems arising out of the relationship was a receipt and option contract for the sale to Standish of a dwelling owned by the respondent, using $10,000 of the client's funds as earnest money. This occurred in November 1975. The purchase price was $60,000.

The contract was induced and prepared by respondent. It was a standard receipt and option contract. The liquidated damages clause was stricken by the respondent. The client had no independent advice and relied completely upon the respondent. Standish was unable to obtain a

loan on the property in an amount sufficient to enable him to exercise the option to purchase, and he therefore demanded the return of his deposit. The respondent did not have sufficient available funds in his business account to comply with the refund demand.

When respondent failed to return the deposit after repeated demands extending over a three or four-week period, Standish retained other counsel to collect the money. At this point, respondent advised his former client, Standish, that unless he completed the purchase by a specified date the respondent would retain the $10,000 deposit as liquidated damages. After some negotiations and further delay, the respondent made a full accounting to Standish and paid him the amount owing. Standish paid his new counsel $1,800 for his services in recovering the funds.

The Committee concluded that "respondent accepted money belonging to his client under circumstances amounting to a trust," and that the money should have been placed in a separate identifiable bank account. Secondly, the Committee concluded that it was improper, under the circumstances, for the respondent to enter into the receipt and option agreement with his client.

The separation of the funds of a client from those of the lawyer is imperative. Commingling such funds inevitably leads to trouble. The evil effects of such a practice are evident here. DR 9-102(A), EC 9-5.

The Code of Professional Responsibility admonishes a lawyer not to enter into any business transaction with a client if the two have differing interests therein and if the client expects the lawyer to exercise his professional judgment for the protection of the client, unless the client has consented after full disclosure. DR 5-104(A). The Committee properly found that the transaction here fell within the proscription of this wise rule.

## VI.  *Conclusion*

The findings of fact, as outlined above, are amply supported by the record. It shows a pattern of delay, procrastination and neglect by the respondent of his clients' legal business. He even misrepresented facts as to progress and misled his clients. In one situation it resulted in the loss of a $4,800 claim, and in two others the clients were compelled to retain other counsel, at substantial expense, to protect their interests. The inconvenience, delay, apprehension and expense unnecessarily imposed on the clients are incompatible with good business and legal practices and contrary to the highest standards of honesty, justice and morality. The conclusions of the Committee as to the violation of the several Disciplinary Rules are apropos to the misconduct of the respondent as set out herein.

We are in full accord with the Committee's recommendation as to the sanctions to be imposed upon the respondent for his several infractions.

It is ordered that the respondent be, and he is hereby, suspended indefinitely from the practice of law, provided that he may not apply for reinstatement for a period of two years from the date of this opinion.

It is further ordered that the costs of these proceedings in the amount of $835.13 be assessed against the respondent and that they be paid to the clerk of this court within 90 days from the date of this opinion.

MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN do not participate.