In the Matter of the Application for the DISCIPLINE OF Douglas E. SCHMIDT, an Attorney at Law of the State of Minnesota.

No. C8–86–177.

Supreme Court of Minnesota.

March 20, 1987.

William J. Wernz, Director, Lawyers Professional Responsibility, Candice M. Hojan, Sr. Asst., St. Paul, for appellant.

Jack S. Nordby, Minneapolis, for respondent.

PER CURIAM.

We address two issues in this attorney discipline case. The first is whether sufficient evidence exists to justify the referee's findings of fact and conclusions of law; if so, the second is whether the referee's recommendation that the respondent, Douglas Schmidt, be temporarily suspended from the practice of law is the appropriate sanction to be imposed.

We answer both questions in the affirmative.

The Director of Lawyers Professional Responsibility (Director) in a petition for disciplinary action charged respondent Douglas E. Schmidt with professional misconduct arising out of Schmidt's representation of an injured plaintiff in a case entitled *Mitchell Van Berkel v. Fox Farm and Road Machinery* venued in the United States District Court, District of Minnesota (File No. 3–83–1118). The disciplinary petition additionally alleged that respondent had violated attorney disciplinary rules by being excessively dilatory and in failing to communicate with his client in a case referred to as the Elmer Lundgren matter. Finally, the petition noted that respondent had previously been issued two private

warnings for neglect of client matters, one of which involved alleged misrepresentations to the client in an effort to conceal the neglect.

■ Respondent Douglas E. Schmidt contends that most of the referee's findings of fact are unsupported by the evidence. He likewise challenges the referee's conclusions of law. In disciplinary cases, we have repeatedly afforded great weight to findings of fact and conclusions of a referee. *In re Getty,* 401 N.W.2d 668 (Minn.1987); *In re Weyhrich,* 339 N.W.2d 274, 275 (Minn.1983); *In re Scallen,* 269 N.W.2d 834, 841 (Minn.1978). While we likewise place great weight upon disciplinary recommendations made by the referees, *In re Fling,* 316 N.W.2d 556, 559 (Minn.1982), the final responsibility for determining appropriate discipline rests solely with this court. *See In re Franke,* 345 N.W.2d 224, 228 (Minn.1984).

■ In this proceeding, the respondent advocates that we should adopt the "beyond a reasonable doubt" proof standard in cases alleging ethical violations by attorneys. He characterizes such attorney disciplinary hearings as being "quasi-criminal," and therefore urges that the standard of proof employed in criminal cases to be more appropriate than our previously utilized "clear and convincing" standard. The argument advanced is not novel. We have previously rejected it. *See, e.g., In re Hanratty,* 277 N.W.2d 373, 375 (Minn.1979). Instead, we have required that the Director's allegations be proved by "cogent and compelling evidence." *See In re Peterson,* 260 Minn. 339, 110 N.W.2d 9 (1961). We ascertain no reason for abandonment of our long-standing standard of proof in disciplinary cases.

■ 1. Utilizing our traditional standard of review, we find the evidence sufficient to support the following factual findings of the referee.

Since his admission to the bar in 1970, respondent Schmidt's practice has primarily been in the area of handling litigation before the courts. Respondent first met Mitchell and Irene VanBerkel in late 1976 at a time he was then representing their daughter, Linda, in a case venued in Dakota County District Court. Mitchell VanBerkel had recently lost an arm as a result of injuries sustained in a farm accident. Respondent discussed Mitchell VanBerkel's claim with him briefly in December 1976 at respondent's office and later in January at the VanBerkel home. Although there was disputed evidence, the referee found that respondent and VanBerkel entered into a retainer agreement on January 20, 1977. Whether the accident date appeared on that retainer agreement when VanBerkel signed it is in dispute, but it is clear that at some time respondent inserted the accident date as being September 6, 1977—an impossibility since the agreement was signed long before that date. In fact, the accident date was September 6, 1976. In 1980, respondent inspected the farm machinery involved in the VanBerkel accident accompanied by an agricultural safety consultant, and later sent an investigator from his office to the farm to photograph the machinery. In September 1983, respondent filed a summons and complaint in the United States District Court on behalf of VanBerkel wherein he sought damages arising out of the farm accident. The complaint alleged the underlying accident had occurred on September 6, 1977.

After having determined that the complaint probably contained the wrong accident date, one of the defense counsel sought from respondent Schmidt medical authorizations to inspect VanBerkel's post-accident medical records. Medical authorizations were sent by respondent's office to VanBerkel for execution. In returning the executed authorizations to respondent, the VanBerkels indicated in writing they thought that because of the lapse of time the matter had been dropped "as the accident happened in September 1976." From VanBerkel's medical records, the defense counsel confirmed that VanBerkel's accident date was indeed September 6, 1976, and that the complaint in the United States District Court therefore incorrectly stated the accident date. Since the action had not

been commenced within the period of the applicable statute of limitations, defense counsel requested that respondent dismiss it and wrote to the respondent that his failure to stipulate to such a dismissal by February 1, 1984, would be followed by a formal dismissal motion including a request for attorney fees "for bringing a frivolous claim." When respondent failed to stipulate to a dismissal by February 15, 1984, the defendant's counsel then filed her motion seeking summary judgment as well as reimbursement of attorney fees and costs incurred by her client. After the motion had been filed, in telephone conversations, respondent informed his client VanBerkel that the federal case should be dropped because the accident date was wrong. He did not, however, inform his client either that a lawsuit was formally pending or that a dismissal motion was pending before the United States District Court. Notwithstanding his failure to so disclose, he did get his client's consent to "drop the case." The day before the scheduled hearing on the motion, a Sunday, in a telephone call to defense counsel, respondent offered to drop the suit if she would dismiss her motion for attorney fees and costs. She declined to do so. Her position was that since attempt to resolve the matter without expense had failed, thereby necessitating that she expend the time and effort to prepare all the documents required to bring the motion before the United States District Court, those attorney fees and costs should be reimbursed.

At the hearing on the motion the following day before the Honorable Edward J. Devitt, Senior Judge, United States District Court, respondent represented certain facts to be true which he knew, or should have known, were incorrect. He asserted that VanBerkel had come to his office many years after the accident had occurred; in fact, VanBerkel and respondent had been in consultation within six months after the accident date. Respondent claimed VanBerkel had given him the wrong accident date; in fact, at all times VanBerkel was aware of the correct date, never misstated it to respondent, and at the time the retainer agreement was signed, respondent knew the date could not be in September 1977. Respondent stated to the court that handwritten notes in his file indicated that VanBerkel had told him the accident happened in 1977; in fact, no handwritten notes concerning conversations with VanBerkel relative to the accident date existed. Respondent told the court that prior to January 24, 1984, he had no reason to know the federal complaint contained the incorrect accident date; in fact, respondent, prior thereto, had met at least three times with his client, received a letter from his client stating the correct date, and had medical reports in his file containing the correct accident date. Respondent informed District Judge Devitt that while he did not resist the dismissal motion, his client, VanBerkel, had difficulty to agreeing to a voluntary dismissal; in fact, VanBerkel had agreed to drop the case because it wasn't a good case, but VanBerkel was unaware either of the pendency of the lawsuit or of the dismissal motion. Finally, respondent represented to the judge that he had been consulting with his client for a period in excess of a month trying to get authorization to dismiss the case; in fact, respondent had not communicated during that time by letter, telephone, or personally with VanBerkel concerning the matter.

After concluding that Fed.R.Civ.P. 11[1] had been violated by Schmidt, Judge Devitt

---

1. Fed.R.Civ.P. 11 insofar as applicable reads as follows:

    **Rule 11, Signing of Pleadings, Motions, and Other Papers; Sanctions** .

    Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name * * * The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. * * If a pleading, motion, or other paper is signed

continued the matter for ten days to afford respondent Schmidt an opportunity to retain counsel and file a responsive memorandum to the pending motions with "a full discussion about any justification you have for this conduct, for your failure to make a full inquiry before you signed your name to that pleading." Following the continued hearing on March 24, 1984, Judge Devitt entered an order granting the summary judgment motion. The order also imposed sanctions upon respondent by ordering him personally to pay the moving party's costs, expenses and attorney fees in the amount of $2,894.62.

2. Sometime in April of 1984, after Judge Devitt's order making him personally liable for the defendant's costs and attorney fees, respondent Schmidt visited the VanBerkels at their home. Shortly thereafter, he followed up that visit with a letter in which he stated that he, Schmidt, would be paying the expenses associated with the handling of the case so there would be no cost to VanBerkel. However, he failed to ever provide a copy of Judge Devitt's March 22, 1984, order to his client Van-Berkel. Later, in June, respondent presented what has been called a closing agreement to VanBerkel who then signed it, and by it the original retainer agreement was cancelled.

The closing agreement, releasing Van-Berkel from any and all obligations for attorney fees and expenses, listed "court costs" of $2,894.62—the exact amount of the defendant's attorney fees ordered by Judge Devitt to be personally paid by respondent and for which VanBerkel was not personally liable. Also, respondent included in the so-called closing agreement the following language:

> The client does acknowledge that he has been advised that he has the right to seek the advice of another attorney regarding the *potential professional liability* of said attorney [respondent] and

any and all legal rights he may have before signing this agreement, has considered said rights and willingly waives the same.

(Emphasis supplied). This language was unnecessary to complete Schmidt's representation of VanBerkel. But, obviously, it was clearly intended to exonerate respondent from further professional liability to VanBerkel.

3. Elmer Lundgren had purchased a motel on a contract for deed. Sometime after the purchase, he suspected the contract vendor had misrepresented income figures to him prior to the sale. He originally attempted to retain respondent to represent him. Schmidt declined. Later, however, in February 1980, respondent was hired by attorney James Maginnis, who was then representing Lundgren, for the sole purpose of preparing and filing a summons and complaint against the contract vendor and of conducting discovery. In return for doing this, respondent was to receive a fee of $500. From the time of the original retainer until September 1983, McGinnis wrote at least six letters and made numerous telephone calls to respondent on behalf of the client in an attempt to ascertain the status of the case. Most of these letters and calls remained unanswered. Additionally, Lundgren himself wrote several times inquiring about the status of the matter, and repeatedly attempted to contact respondent by telephone over a five-year period. Most of the phone calls were never returned.

Respondent had commenced the Lundgren action in September 1980, but little further was done on the matter until after Lundgren filed an ethics complaint with the Lawyers Professional Responsibility Board in 1984. During the spring of 1985, respondent failed to respond either to mail or telephone calls from Lundgren. Finally, their professional relationship was termi-

in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

nated in September 1985 when, more than five years after he had originally agreed to do so, respondent completed the discovery work in the Lundgren case.

Although respondent disputed some of the factual findings in both cases, our examination of the record before the referee convinces us there existed clear and convincing evidence to support his factual findings.

Moreover, we conclude the factual findings support the referee's six conclusions of law. Respondent's misrepresentations, by affidavit and personally, to Judge Devitt, in an attempt to exculpate himself and inculpate his client violated DR 1–102(A)(4), (5) and (6) and DR 7–102(A)(5) and (6), Minnesota Code of Professional Responsibility (MCPR). Respondent's neglect of the VanBerkel suit resulting in the running of the statute of limitations violated DR 6–101(A)(2) and (3), MCPR. Respondent's refusal, without cause, to voluntarily dismiss the VanBerkel action when respondent knew there was no legal alternative, and his failure to communicate with his client regarding the statute of limitations bar to the suit or to inform the client of the proceedings concerning the pendency of the action in federal court violated DR 7–102(A)(1) and (2), MCPR. By procuring from VanBerkel a release from professional liability, Schmidt violated DR 6–102(A), MCPR. His misrepresentation to VanBerkel that the latter had responsibility for attorney fees personally which actually had been personally assessed against respondent, in order to secure the release from liability violated DR 1–102(A)(4), (5) and (6) and DR 7–101(A)(3), MCPR. Finally, respondent's conduct in failing to communicate with either Lundgren or Maginnis, his failure to answer letters or return telephone calls, and his failure to timely complete the objectives of his retainer violated DR 6–101(A)(3), MCPR.

The referee has recommended a public reprimand and a six-month suspension. Obviously, the referee's recommendation of this severity is primarily based upon respondent's misrepresentation to the United States District Court, his client, and the adversary attorney during the course of respondent's handling of the VanBerkel matter. Respondent here contends that if any incorrect statements were made by him during the handling of the VanBerkel matter arising to the characterization of misrepresentations, the statements were made in good faith and were unintentional. He asserts that severe discipline, such as suspension, for misrepresentation should be justifiable only when the misrepresentations have been intentional. Even if we were to accept that contention, such acceptance would not militate against imposition of severe discipline in this case. While some of the misrepresentations made by respondent charitably might be viewed as oversights, clearly others similarly made cannot be so explained away. The representations made to opposing counsel relative to the dismissal motions, and particularly the misrepresentations made to Judge Devitt at the two March 1984 hearings were patently false and in no way can be characterized as being unintentional or to have been made in good faith.

To a great degree our system for the administration of justice is based upon the integrity of the lawyers who handle litigation before the courts. Attorneys at law are officers of the court and have been so regarded for centuries. As we have done in Minnesota, traditionally courts have established procedures by way of bar admission requirements and standards to attempt to insure that only those who possess that integrity shall be admitted to practice. When we admit an applicant to the bar, in effect, we are certifying to the bench, to the bar, and to the public that that person possesses character traits of honesty and personal integrity. Likewise, when, notwithstanding such pre-admission scrutiny, a lawyer demonstrates a lack of that truthfulness and candor that the courts have a right to expect of their officers to the end that the system of justice will not be undermined, courts do not hesitate to impose severe discipline. This court has noted that, "An attorney who deliberately deceives the court is guilty not

only of obstructing the administration of justice but also of subverting that loyalty to the truth without which he cannot be a lawyer in the real sense of the word." *In re Nilva,* 266 Minn. 576, 583, 123 N.W.2d 803, 809 (1963). Thus, we have disbarred an attorney who made false and fraudulent representations to a legislative committee, *In re Disbarment of Cary,* 146 Minn. 80, 177 N.W. 801 (1920), as well as one who made false representations to a court, *In re Disbarment of Miller,* 199 Minn. 295, 271 N.W. 593 (1937), and one who testified falsely before United States District Court judges. *In re Disbarment of Hertz,* 169 Minn. 431, 211 N.W. 678 (1927). More recently we have approved a stipulation providing for a two-year suspension from the law practice for one who, among other unethical acts, made false statements to a state district court. *In re Pyle,* 363 N.W.2d 303 (Minn.1985). *See also In re Appert,* 363 N.W.2d 301 (Minn.1985).

Our view that a lawyer who makes false representations to the court or other legal tribunal merits severe disciplinary sanctions is shared by courts of our sister jurisdictions. *See, e.g., Attorney Grievance Commission v. Levitt,* 286 Md. 231, 406 A.2d 1296 (1979) (one year suspension); *In Matter of Nigohosian,* 88 N.J. 308, 442 A.2d 1007 (1982) (six months' suspension); *In re Greene,* 290 Or. 291, 620 P.2d 1379 (1980) (60 days' suspension).

Moreover, in the case at hand, respondent compounded his mendacity by misrepresenting facts to opposing counsel. In and of itself, such conduct warrants severe discipline. *See, e.g., In re Lynnel Jones,* 383 N.W.2d 303 (Minn.1986). Without question, likewise, similar misrepresentations made to a client justifies the imposition of severe discipline. *In re Peck,* 302 N.W.2d 356 (Minn.1981); *Matter of Murphy,* 325 N.W.2d 826 (Minn.1982).

Respondent concealed from VanBerkel that he had been censured by Judge Devitt, and if not directly, at least by clear implica-

tion represented the liability for the attorney fees and costs, which Judge Devitt had imposed on respondent personally, to be the responsibility of the client. This court has not, and does not herein, adopt the Standards for Imposing Lawyer Sanctions promulgated by the American Bar Association. Nevertheless, the seriousness of client deception by a lawyer is reflected in the adoption by the American Bar Association of Standard 4.61 which recommends that generally the most severe sanction should be imposed.[2]

In addition to the misrepresentations made in the VanBerkel case, in both that case and the Lundgren matter, respondent grossly neglected his client's matters, and, not only neglected the matters, but failed to keep in communication with his clients and answer their inquiries concerning their cases. The result was that VanBerkel lost whatever rights he had to recover damage for the loss of an arm (a claim which respondent himself characterized as viable when appearing before Judge Devitt), and resolution of the Lundgren matter was protracted over a five-year period. In the past we have not failed to impose severe disciplinary sanctions for similar neglect. *See, e.g., In re Smith,* 381 N.W.2d 431 (Minn. 1986); *In re Weyhrich,* 339 N.W.2d 274 (Minn.1983). Perhaps respondent's conduct cannot be equated with the type of misconduct meriting disbarment or indefinite suspension, but when joined with other professional misconduct, it does deserve severe discipline.

Finally, respondent's attempt to absolve himself from any claim VanBerkel may have had against him for professional malpractice warrants serious condemnation as well as discipline. The disciplinary rules in effect at the time of the VanBerkel "closing" clearly barred respondent from any attempt to exonerate himself from personal malpractice liability. DR 6–102(A), MCPR

---

2. Standard 4.61 states:
Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client.

(1984).[3] Schmidt contends that the rule only applies to pre-representation agreements. Though we have not heretofore passed upon the issue, other courts have. An impressive array of cases find violations of the rule for activities of the lawyer occurring *after* commencement of representation.[4] Those cases generally hold not only that a violation of DR 6–102(A) incurred after commencement of the representation of the client subjects the attorney to disciplinary sanctions, but also that the attorney has the affirmative obligation before taking a liability release from a client to advise the client of the client's right to seek other counsel and to advise the client as to the nature and existence of any potential claim. *See, e.g., Tallon,* supra.

Moreover, when urging us to hold that the rule prohibiting attempts by lawyers to absolve themselves from professional malpractice to be "prospective," respondent improperly identifies the event to which the liability release must be prospective. The event which "kicks in" the bar of the rule is not one that occurs before representation commences; rather it is an event that occurs before the client realizes that malpractice may have occurred. The adoption of the latter triggering event eliminates any concern that an attorney might be subject to disciplinary censure if he or she settles or defends a malpractice action brought by a former client.

We recognize, as did the referee, that for many years the respondent has generously contributed his time and his many talents to commendable bar and related activities, and that he enjoys a deserved reputation for professional competence. Furthermore, it appears that respondent has recognized his problems—especially with regard to expeditious handling of legal matters and client communications by taking effective steps to improve the management of his practice. Undoubtedly, he has already

sustained a substantial penalty, both financially and personally. However, respondent's generosity and the giving of his time and talents to his profession, even when coupled with the financial loss and personal humiliation to him caused by these proceedings are insufficient to serve as any substantial mitigation of his conduct.

For many years we have recognized that disciplinary action is not to punish the errant lawyer, but rather to guard the administration of justice, to protect the courts, the legal profession and the public. *In re Smith,* 220 Minn. 197, 19 N.W.2d 324 (1945). Unfortunately, the respondent's conduct forming the basis of this disciplinary action does not arise out of an isolated nor aberrant action. In 1977 respondent was issued a warning for neglect of a client's legal matter and for fabrications offered in an attempt to conceal that neglect. In 1981 respondent was issued another warning for neglect of a client's legal matter.

After weighing all of the circumstances of these proceedings, we concur with the referee's recommendation. Accordingly, we hereby publicly reprimand respondent Douglas E. Schmidt. We further hereby suspend him from the practice of law for a period of six months from the date of this opinion. Respondent shall forthwith comply with Rule 26, Rules on Lawyers Professional Responsibility. Compliance with Rule 18(e), Rules on Lawyers Professional Responsibility with respect to reinstatement after suspension is hereby waived.

---

**3.** DR 6–102(A), MCPR (1984) reads:

A lawyer shall not attempt to exonerate himself from or limit his liability to his clients from his personal malpractice.

**4.** *See, e.g., People v. Good,* 195 Colo. 177, 576 P.2d 1020 (1978); *In re Christian,* 238 Kan. 451, 709 P.2d 987 (1985); *Tallon v. Committee on Professional Standards,* 86 A.D.2d 897, 447 N.Y. S.2d 50 (1982); *In re Amick,* 288 S.C. 486, 343 S.E.2d 623 (1986).