(No. 68433.—

*In re* KENNETH J. ROTMAN, Attorney, Respondent.

*Opinion filed May 30, 1990.*

Samuel J. Manella, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Louis B. Garippo and Susan G. Feibus, of Louis B. Garippo, Ltd., of Chicago, for respondent.

JUSTICE CALVO delivered the opinion of the court:

On February 25, 1987, the Administrator of the Attorney Registration and Disciplinary Commission filed a two-count complaint against respondent, Kenneth J. Rot-

man, an attorney admitted to the practice of law in Illinois in 1982. The complaint alleged respondent had converted an aggregate amount of $15,038.05 from the estate of Moe Levy, an incompetent. Respondent filed an answer on April 10, 1987, and admitted committing the misconduct alleged in the complaint.

We must decide in this case whether respondent was denied due process by the procedures followed in the hearing process. If respondent was not denied due process, we must then determine the appropriate sanction for the proven misconduct of respondent.

## I. Background

A hearing was held before the Hearing Board on May 21, 1987. Respondent and the Administrator agreed to proceed before a Hearing Board which consisted of two panel members, Mr. Fornelli and Mr. Popejoy. Each panel member submitted a separate report on August 5, 1987; both agreed the Administrator had proved the alleged misconduct by clear and convincing evidence. Panel member Popejoy recommended respondent be disbarred. Panel member Fornelli recommended respondent be suspended from the practice of law for two years.

Respondent brought exceptions to the recommendations of both panel members before the Review Board. The Administrator brought an exception to the recommendation of panel member Fornelli before the Review Board. On November 13, 1987, the Review Board remanded the matter to the Hearing Board for further proceedings consistent with Supreme Court Rule 753(c) (107 Ill. 2d R. 753(c)) and Commission Rule 201. Rule 753(c) requires the Hearing Board to consist of not less than three members. The concurrence of a majority is necessary for a decision by the Hearing Board.

Sheldon J. Sandman was designated by the chairman of the Hearing Board to be the third panel member. The

Administrator filed a motion on November 18, 1987, with the Hearing Board to take the matter under advisement for a review of the record by panel member Sandman for the purpose of consultation with panel members Fornelli and Popejoy on an appropriate disciplinary sanction. The Administrator stated in his motion the facts were not in dispute. According to the Administrator, the record was sufficient to allow panel member Sandman to review the record and consult with panel members Fornelli and Popejoy to reach a decision pursuant to Supreme Court Rule 753(c)(2) and Commission Rule 201.

Respondent filed a response to the Administrator's motion and argued that a limited *de novo* hearing was necessary to allow the Hearing Board to render an appropriate decision. Respondent stated in his response that material changes in circumstances occurred between the May 21, 1987, hearing by the Hearing Board and the remanding of the case to the Hearing Board and the appointment of panel member Sandman to the Hearing Board.

Respondent sought a *de novo* hearing for the limited purpose of presenting additional evidence in mitigation directed solely to the discipline to be imposed. Respondent contended the panel members present at the May 21, 1987, hearing had made credibility findings regarding the factors advanced by respondent in mitigation. Therefore, according to respondent, no Hearing Board recommendation of discipline would be appropriate without each panel member's having the opportunity to observe respondent's testimony and to personally assess respondent's credibility. Respondent requested the *de novo* hearing be held by a panel composed of three new members.

On March 1, 1988, the Hearing Board ordered a *de novo* hearing for the limited purpose of hearing testimony and evidence as to changes in circumstances since the prior hearing. The limited *de novo* hearing was held

on June 22, 1988, before panel members Popejoy, Fornelli and Sandman.

Panel member Sandman filed his report on August 3, 1988, concurring with panel member Fornelli's recommendation that respondent be suspended for two years. Respondent filed exceptions with the Review Board to panel member Popejoy's recommendation of disbarment and to panel members Fornelli's and Sandman's recommendation of a two-year suspension. On that same day, respondent requested the opportunity, pursuant to Supreme Court Rule 753(e)(2) and Commission Rule 302, for the submission of a brief and for oral argument before the Review Board. The Review Board, on September 13, 1988, allowed respondent to file a brief limited to the issue whether the remanded hearing should have been conducted *de novo* before a different hearing panel. Both the Administrator and respondent submitted briefs on this issue, and oral argument before the Review Board occurred on December 9, 1988.

The Review Board filed its report and recommendation on December 13, 1988. The findings of fact and conclusions of law of the Hearing Board were adopted by the Review Board. A majority of the Review Board recommended respondent receive a two-year suspension from the practice of law. A dissenting member recommended respondent be disbarred. The Review Board did not address the issue of *de novo* review.

The Administrator filed a petition for leave to file exceptions to the recommendation of the Review Board of a two-year suspension. Respondent filed exceptions to the recommendation made by the Review Board. This court allowed the Administrator's petition on March 29, 1989.

In this case, respondent does not dispute that he, without authority, knowingly converted $15,038.05 from the estate of Moe Levy, a person adjudicated incompe-

tent to manage his own financial affairs. Respondent only disputes the degree of discipline to be imposed.

Respondent was the only person who testified at the hearing held on May 21, 1987, before panel members Popejoy and Fornelli. Respondent graduated from the University of Illinois with a degree in accounting. While an undergraduate, respondent was a member of a fraternity; respondent served as fraternity treasurer for two years. Respondent also served on the board of directors for the Illini Publishing Company.

Respondent graduated from Northwestern Law School. After respondent's first year in law school, respondent was employed as a summer associate with the law firm of Kirkland and Ellis in Chicago, and continued working for this law firm during the first semester of his second year in law school. During respondent's second semester of his second year of law school, respondent was employed with the law firm of McDermott, Will and Emery in Chicago. Respondent continued working for the McDermott firm during the summer after his second year of law school, during his third year of law school, and continued working as an associate attorney after graduating from law school. After working for the McDermott firm as an associate attorney for a little over a year, respondent started working for the law firm of Wildman, Harrold, Allen and Dixon in Chicago.

Respondent was employed with the Wildman firm from May 31, 1983, until May 25, 1984. One of respondent's responsibilities while at the Wildman firm was the handling of the estate of Moe Levy, an incompetent. Stanley Ginsberg was the guardian of this estate.

The estate of Moe Levy maintained savings accounts in the Peterson Bank and in Citicorp Savings of Illinois. On February 2, 1984, Mr. Ginsberg directed the Peterson Bank to liquidate the savings account of the estate of Moe Levy. The proceeds were to be remitted to re-

spondent for purposes of the estate. The Peterson Bank issued a cashier's check to respondent on April 2, 1984, for $5,392.10, payable to "Stanley Ginsberg, Guardian of the Estate of Moe L. Levy."

Citicorp closed the two accounts of the estate of Moe Levy on April 27, 1984. Citicorp tendered the proceeds to respondent in two checks payable to Stanley Ginsberg as guardian of the estate. One check was in the amount of $4,038.05; the other check was for $5,607.90.

Respondent converted the proceeds of these savings accounts by endorsing each check "Stanley Ginsberg, guardian of the Estate of Moe L. Levy, Kenneth Rotman, attorney," and depositing the checks into his personal bank account. The conversions occurred in April 1984.

While at the Wildman firm, respondent began trading in commodities. Respondent obtained a trading account with Haas Securities. Respondent lost money in the account and converted the funds from the estate of Moe Levy in order to pay, at least partially, the debit balances in that account. When respondent deposited, into his personal checking account, the monies which were to be used for the purposes of the estate of Moe Levy, respondent knew he was converting client funds. Respondent also knew that conversion of client funds was a violation of his sworn duties as an attorney.

Respondent left the Wildman firm on May 25, 1984, to work as a commodities trader. Respondent then participated in a one-month learning position with a person referred to by respondent as a "well-known trader." Respondent leased a seat on the floor of the Chicago Board of Trade and began trading options on treasury bond futures.

In April 1985, respondent became employed with the law firm of Cadwalader, Wickersham and Taft as an associate attorney in the Cadwalader firm's Washington,

D.C., office. According to respondent, his prior work as a tax attorney and his work as a commodities trader were important factors in the Cadwalader firm's interest in him. Respondent was not asked about the circumstances under which he had left his employment with the Wildman firm. Thereafter, respondent went to work in the Cadwalader firm's New York office.

In January 1985, John Malarkey, an associate with the Wildman firm, contacted respondent and asked respondent if he knew about the funds of the estate of Moe Levy which had been in the Peterson Bank account. Respondent volunteered to Mr. Malarkey that he had the funds. Respondent did not tell Mr. Malarkey that he had converted the Peterson Bank funds and did not refer to the Citicorp funds which he had also converted. Respondent then attempted to repay the $5,392.10 he had converted from the Peterson Bank account to the Wildman firm. The line of credit upon which respondent relied to pay the Wildman firm did not materialize, however, and the check was returned due to insufficient funds.

On March 28, 1985, the Wildman firm paid the estate of Moe Levy $5,904.72: this amount included $5,392.10 for the funds of the Peterson Bank account plus $512.62 interest. Sometime thereafter, the Wildman firm notified the Commission concerning respondent and the monies missing from the estate of Moe Levy. On May 7, 1985, the Commission sent respondent a copy of the Wildman firm's charges, requesting a response. On June 1, 1985, respondent tendered $4,392.10 to the Wildman firm for partial payment of the $5,904.72 which had been paid by the Wildman firm to the estate of Moe Levy.

Prior to June 4, 1985, the Wildman firm discovered the two accounts maintained for the estate of Moe Levy at Citicorp had been closed and the proceeds tendered to respondent. The Wildman firm notified the Commission

of this by letter dated June 4, 1985. On or about June 7, 1985, the Wildman firm paid the estate of Moe Levy $10,718.94. This amount consisted of restitution for the funds converted by respondent from the two Citicorp accounts, plus interest.

On December 6, 1985, respondent tendered $12,231.56 to the Wildman firm for the remaining funds the firm had paid to the estate of Moe Levy. Respondent's parents had borrowed the money and loaned it to respondent. At the time of the hearing before the Hearing Board on May 21, 1987, respondent was in the process of paying back this loan. This amount, when added to the previous partial payment of $4,392.10, equaled the $16,623.66 paid by the Wildman firm to the estate of Moe Levy. The amount did not include any interest payments to the firm for the money so paid to the estate of Moe Levy.

Respondent told the Hearing Board he had suffered tremendous financial losses during the end of the period in which he was trading commodities which caused respondent considerable financial and psychological pressure. In or around October of 1984, approximately four months after leaving the Wildman firm, respondent sought psychological help with Dr. Jeff Garfield, who specializes in working with commodities traders. Respondent remained in contact with Dr. Garfield even after he stopped being a commodities trader.

In the winter of 1984, respondent started to volunteer at the Ezra Hotline in Chicago to answer calls from people in need of shelter or food, or who had other problems. Respondent would do this once or twice a week for four hours. Respondent continued this volunteer work until he left to start work on the East Coast in April of 1985.

In the fall of 1986, respondent coached a group of children who played football. Respondent coached the

children for seven weekends. The second weekend in which he coached the children, respondent bought each child a jersey.

As of May 21, 1987, the date of the first hearing, respondent stated, he had "recently for the last few months every fourth Sunday or so or when it's needed—they have my phone number"—started working in a soup kitchen at St. John The Divine Church.

As part of respondent's job at the Cadwalader firm, respondent told the Hearing Board, he no longer handled any money in a fiduciary capacity. Respondent stated that a recommendation of disbarment or suspension "would not only effectively end my career at Cadwalader but probably effectively end my legal career altogether." In response to his counsel's question if respondent had anything to add as to how the disciplinary action had affected him and his feelings, respondent stated:

> "I do and I could probably speak them for weeks and months because literally every day that has happened since this began, this is in the back of my mind; and I wish I had not done it and I know how wrong it was and it just makes me feel terrible to know what kind of effect this could have on my future."

Respondent stated he had not told his employer, the Cadwalader firm, of the pending disciplinary action against him. In his position with the Cadwalader firm, respondent needs only to be a member in good standing of any bar in any State. The Cadwalader firm is aware that respondent is licensed in Illinois only, and not in New York or Washington, D.C. At the time of the first hearing on May 21, 1987, before the Hearing Board, respondent had been with the Cadwalader firm for over two years.

The following exchange occurred between respondent and the Administrator:

"Q. You've been working [at the Cadwalader firm] now over two years?

A. That's correct.

Q. Why haven't you told them?

A. I really feel that it would either prevent me from becoming partner someday or they would all look at me in a different light.

Q. Do you think they have a right to know?

A. I think they have a right... I'm not... I just don't know, Sam. I think they have a right that I not do what I did before. That's for sure."

The Administrator argued that respondent's misconduct warranted disbarment. Counsel for respondent argued the appropriate discipline was censure.

In his report, panel member Popejoy noted respondent cooperated with the Administrator, but then stated:

"[T]he facts and Respondent's actions dating back to 1984 and the conversion of funds of the estate and the records of his actions are so cold, calculated and unquestionably clear that Respondent would have no choice but to cooperate and admit. The facts were clear and proof was a matter of record."

Panel member Popejoy also noted respondent failed to present any evidence other than respondent's "own testimony as to his activities in life; his reputation in the community both residential and in the law community." Further, panel member Popejoy stated:

"Taking [respondent's] testimony completely and for what it is worth he had the benefit of a healthy home life, academic achievement, excellent life experiences and the promise of a successful career.

All these facts were unable to deter the Respondent in the past from doing the acts alleged in the Complaint that not only could destroy his reputation but even worse, bring the legal profession into disrespect."

Concerning respondent's decision to keep the disciplinary proceedings a secret from his present employer, panel member Popejoy stated:

"This in itself indicates to me Respondent continues to hide from his errors of the past. This fact leads me to fear Respondent has not faced up to his responsibilities. His promises to 'never again' is not convincing to me. Though I have searched my mind I cannot find any mitigating circumstances."

Panel member Popejoy concluded no mitigating circumstances were present and recommended respondent be disbarred.

Panel member Fornelli recommended respondent be suspended from the practice of law for two years. In his report, panel member Fornelli noted:

"Respondent was the only witness in his own behalf. He testified as to his education; his standing and activities as a student; and his high academic record in law school. Taking his testimony completely as true, we hear that he had the benefit of a healthy home life, good academic achievement, excellent life experience and promise of a successful career. Upon graduation, he was employed by a prestigious lawfirm. Unfortunately, instead of remaining in his chosen field where he showed signs of having a bright future, Respondent answered the siren call of quick riches. Like Gossamer, his dreams of millions made in the commodities market faded with the realities of life. Finding himself out of his element and drowning in red ink, he succombed [sic] to the temptations of latching on to what he considered his only life jacket, funds that did not belong to him."

After acknowledging that respondent failed to inform his new employer or his clients of the pending disciplinary charges against him, panel member Fornelli stated:

"We appreciate his dilemma, fully cognizant that this type of action would not sit well with his employer or his peers. He chooses to hide from the reality of his offense

and raises serious questions concerning his contriteness and resolve to avoid this type of action in the future.

Because he told no one of this indiscretion, he is unable to bring in character witnesses to attest to his good qualities. This leaves the Panel with no information concerning his reputation in the legal profession and the community at large."

Panel member Fornelli took into consideration the seriousness of the offense and respondent's youth and inexperience in recommending a suspension of two years.

On June 22, 1988, respondent appeared for the limited *de novo* hearing before panel members Popejoy, Fornelli and newly appointed member Sandman. Respondent told the Hearing Board that he had left the Cadwalader firm on October 9, 1987. While at the Cadwalader firm, respondent was one of several attorneys working with a client of the Cadwalader firm, the Fred Manko family. The Manko family asked respondent if he would replace their outgoing executive officer, and respondent accepted.

Respondent is now associated with three of the Manko family's firms: New Windsor Associates, L.P., an arbitrage firm trading in government securities, and stocks and options; Compco Dealers, a metals trading firm; and Carnegie Realty Holding Corporation, a building real estate syndicate in New York City.

Respondent informs this court that he is not presently employed as a lawyer. According to respondent, when he first left the Cadwalader firm in October 1987, his employment contract with the Manko family stated he would work as an attorney for the first six months of his employment, but after six months he would no longer serve as an attorney. As of June 22, 1988, the date of the limited *de novo* hearing, respondent still spent a few hours a week with his former employer, the Cadwalader

firm, consulting on cases for which respondent had responsibility when he left the firm.

Respondent told the Hearing Board he had repaid the money loaned to him by his parents, and currently contributes to his mother's support. Regarding charitable and philanthropic activities, respondent informed the panel members that he is president of the board of directors of a not-for-profit off-Broadway theater. Respondent had been a board member of the Pearl Theater Company for a year. During the 12 months preceding the *de novo* hearing, respondent informed the panel members, he had contributed over $10,000 in cash to the theater company. Respondent estimated he spends 10 to 15 hours a month with the theater company.

Three months prior to the *de novo* hearing, respondent became a board member of a not-for-profit dance company, the Offspring Dance Company. Respondent estimated he spends two or three hours a month with the dance company. Respondent informed the panel members that he has contributed approximately $2,000 to the organization.

In 1987, respondent was a member of a lawyer's group, as a representative of the Cadwalader firm, which conducts an annual fundraiser before Thanksgiving in order to raise funds for the New York City Meals on Wheels. During football season in 1987, respondent again coached a children's football team. Respondent still participates in the soup kitchen held at St. John The Divine Church, although not as consistently as before.

Panel members Fornelli and Popejoy did not issue new recommendations. Panel member Sandman filed his recommendation on August 3, 1988. Panel member Sandman noted he had read and familiarized himself with the complete file in this matter, including the transcript of the prior proceedings. Panel member Sandman

concurred with panel member Fornelli in the recommendation of a two-year suspension.

Panel member Sandman noted that respondent testified concerning his previous and present employment in highly responsible positions, and added:

> "However, [respondent] admitted on direct examination that he has not told any member of his former New York firm or his present employer of the charges pending against him before the Attorney Registration and Disciplinary Commission in Illinois."

## II. *De Novo* Review

Respondent agreed to proceed before only two panel members at the May 21, 1987, hearing. Because the two panel members did not agree as to the recommendation of discipline, the Review Board remanded the case to the Hearing Board, and a third panel member was appointed.

It was respondent's position before the Review Board that respondent should receive a *de novo* review limited to the "purpose of presenting additional evidence in mitigation directed solely to the sanction to be imposed." It is now respondent's position that he should have received an unlimited *de novo* review, as opposed to a limited *de novo* review, before three new panel members.

It was the position of the Administrator that no limited *de novo* hearing was necessary; since the facts were not in dispute, the record was sufficient to allow the new panel member, Mr. Sandman, to reach a recommendation of the appropriate discipline. Respondent argues the panel members made credibility findings regarding mitigation at the initial hearing and a review of the transcript of the initial hearing by panel member Sandman would be inadequate for a decision regarding discipline.

Respondent now argues he was denied his right to due process because he did not receive an unlimited *de*

*novo* review before three new panel members. We do not agree. Respondent's due process rights were not violated by the procedures employed below. Respondent agreed to proceed before a Hearing Board which consisted of only two members. The two panel members agreed the Administrator had proved respondent's misconduct by clear and convincing evidence. It was only because the two panel members disagreed as to the recommendation of discipline that the Review Board remanded the case to the Hearing Board.

Respondent asked for and received a limited *de novo* hearing "directed solely to the sanction to be imposed." The only witness was respondent. The new panel member, Mr. Sandman, had the opportunity to personally observe respondent's testimony and to personally judge respondent's credibility. There were no factual disputes.

The only issue before the Hearing Board concerned the appropriate sanction. "[W]hen it comes to imposing discipline, the final responsibility rests with this court." (*In re Hopper* (1981), 85 Ill. 2d 318, 323.) This court has noted "where the factual issues are undisputed, the Review Board is as capable as the hearing panel of assessing and recommending appropriate discipline." (*In re Feldman* (1982), 89 Ill. 2d 7, 11.) Under the facts of this case, an entirely new hearing on all the issues before three new panel members would have served no purpose but that of delay.

### III. Disciplinary Sanction

Respondent argues that, "based upon the interest of fairness and the presence of a variety of mitigating circumstances," the appropriate sanction should be censure. As respondent correctly points out, sanctions in cases involving client funds range from disbarment to censure. *Feldman*, 89 Ill. 2d 7 (disbarment); *In re Grant*

(1982), 89 Ill. 2d 247 (two-year suspension); *In re McLennon* (1982), 93 Ill. 2d 215 (censure).

Respondent asserts that "numerous mitigating circumstances" are present in this case. According to respondent, the volunteer work about which he testified before the Hearing Board should be considered in mitigation as "[t]hese efforts demonstrate [respondent's] ability to be an asset to his community and his desire to make up for his misconduct."

According to respondent, his conduct during the delay in time from his conversion of funds to the present, 5½ years at the time of the filing of the briefs, now going on six years, should be considered in mitigation. Respondent informs this court he devised his own self-imposed suspension for the past two years in that he has almost completely stopped practicing law. Respondent characterizes the two years before this self-imposed suspension as a self-imposed period of probation.

Because he effectively has been on probation for four years and has not practiced law for two years, and since, according to respondent, he has conducted himself appropriately, respondent believes he has "in effect served any punishment that should have been imposed."

Respondent chose not to inform either his prior employer, the Cadwalader firm, or his present employer, the Manko family, of this pending disciplinary proceeding. As a result of respondent's choice not to inform his prior and present employers, which respondent characterizes as an "extremely difficult choice," respondent was unable to present a single witness to testify on his behalf. The only testimony for this court to review is that of respondent himself.

Respondent points out his "selection by the family and the confidence they have placed in him, after inquiry into his background, further demonstrates [respondent's] good character and reputation. It is reasonable to con-

clude therefore that aside from the conduct charged in the complaint, [respondent] is of good character and has a good reputation. Accordingly, his character and reputation should be considered in mitigation."

Under the circumstances of this case, we do not agree the complete absence of any testimony, except for respondent's own statements concerning his character and reputation, may be construed as a mitigating factor. Panel members Popejoy, Fornelli and Sandman all expressed their concern of respondent's decision to keep the disciplinary proceedings a secret.

Respondent may sincerely believe his past employment with a major law firm and his present employment with a private family reflect favorably upon his character and reputation. It is the opinion of this court, however, that any inquiry into respondent's background which did not include knowledge of the pendency of this disciplinary action would be incomplete. Without this information, the mere fact of employment by a law firm or private family, no matter how prestigious, does not lead inexorably to the conclusion that respondent is of good character and reputation.

The mitigating factor upon which respondent primarily relies is his youth and inexperience at the time of his misconduct. At the time of the conversion, respondent was 26 years old and had been practicing law for less than two years. We agree that inexperience in the practice of law may be a mitigating factor under the appropriate circumstances. It is not always crystal clear exactly what conduct is prohibited and what is allowed under each and every disciplinary rule in the Code. There may be situations where it is not apparent whether certain acts or omissions on the part of an attorney may or may not be prohibited under the Code. There may be instances where reasonable persons may

differ over whether certain conduct is permitted or prohibited under a given disciplinary rule.

It is expected that the wisdom gained from long years of practice in the legal profession will inform the exercise of professional judgment on the part of an experienced attorney when he or she is faced with a decision, the consequence of which may or may not result in an act or omission prohibited under a given disciplinary rule. When faced with such a decision, it would indeed appear unfair to treat an inexperienced lawyer who has been admitted to the practice of law for less than two years exactly the same as an attorney who has practiced law for 20 years. An attorney admitted to the practice of law for less than two years may lack the experience which informs the exercise of professional judgment in cases where the prohibition of certain conduct by the Code is unclear in application and scope.

The wrongful acts of respondent in this case do not consist of conduct which might be permitted under some circumstances and prohibited under others. Respondent did not have to draw upon years of experience to inform the exercise of his professional judgment. Reasonable persons may find absolutely no room for disagreement as to the prohibition under the Code of the wrongful acts of respondent. There is nothing ambiguous about the prohibition against taking, without authority, money from the account of a client adjudicated as incapable of handling his own financial affairs and using that money for purposes unrelated to the interests of the client. All the experience in the world would be of no benefit to any attorney faced with the decision whether or not to convert client funds entrusted to his or her care. It is a simple rule, easy of application and admitting of no exception: do not steal your client's money.

During respondent's time in law school, he worked for a law firm the summer after his first year, both se-

mesters of his second year, the summer of his second year, and both semesters of his third year. Respondent was employed as an attorney for almost two years when he converted the funds. Even someone who has never gone to college, let alone law school, knows it is wrong to steal. Under these circumstances, we do not agree that respondent's "youth and inexperience" in the practice of law can be seen as a weighty factor in mitigation.

Respondent contends his misconduct should subject him only to censure, and refers this court to numerous cases involving conversion of client funds where the appropriate sanction was found to be censure.

A review of these cases reveals the presence of mitigating factors absent in this case. In *In re Young* (1986), 111 Ill. 2d 98, there was no evidence of a "dishonest motive" on the part of the attorney and there existed a *bona fide* title problem with respect to a client's property.

There was no evidence of a dishonest motive in either *In re McLennon* (1982), 93 Ill. 2d 215, or in *In re Clayter* (1980), 78 Ill. 2d 276, both cited by respondent. In *McLennon*, there was persuasive evidence of substantial contributions by the attorney over many years of his time and legal talents in assisting troubled individuals and handicapped groups. The attorney in *Clayter* likewise had an outstanding record in community service programs. In *McLennon*, several witnesses testified on behalf of the attorney and several others submitted affidavits concerning respondent's character and reputation. Character witnesses of undeniable integrity testified for the attorney in *Clayter*.

The evidence in *In re Lenz* (1985), 108 Ill. 2d 445, showed the misconduct of the attorney to be an isolated act in a more than 20-year practice. There were several character witnesses who had known the attorney for several decades who testified to the attorney's good rep-

utation. The trust fund in question had insufficient funds for only a six-week period, and the attorney had been involved in extensive *pro bono* work and community service.

The attorney in *In re Enstrom* (1984), 104 Ill. 2d 410, did not directly convert the client funds in question himself, and did not utilize the funds for his own personal use or benefit. The misconduct in *In re Ahern* (1961), 23 Ill. 2d 69, was not shown to have resulted from corrupt motives. In *In re Freel* (1982), 89 Ill. 2d 263, this court found the Hearing and Review Boards did not err in refusing to find the attorney had converted client funds.

The presence or absence of a dishonest motive is an appropriate factor to consider in determining the nature of the sanction to be imposed (*Clayter*, 78 Ill. 2d at 283), as is testimony concerning the character and reputation of an attorney in the community.

In this case, respondent knew he was violating his oath as an attorney when he took over $15,000 of his client's money. There was no question about respondent's motives: respondent testified he took the money to pay debts incurred from his activities as a commodities trader. Respondent presented not a single witness on his behalf. This court has before it only the statements of respondent concerning his community service. Taking respondent's testimony completely as true, it is still unclear just what amount of time respondent spent serving the community in either Chicago or New York.

Respondent asserts the fact he made restitution to the Wildman firm after the Wildman firm repaid the funds taken by respondent from the estate of Moe Levy should be considered in mitigation. While it is true that restitution is an appropriate factor in mitigation, it is also true that restitution does not purge the original wrongdoing. (*In re Rosenberg* (1953), 413 Ill. 567.) In this case, restitution came only after an investigation

was initiated by the Commission and was not complete until 20 months after respondent first converted the funds from the estate of Moe Levy.

Respondent, knowing it to be a violation of his sworn duties as an attorney, intentionally converted monies from the estate of a client who had been adjudicated incompetent. This court has severely condemned intentional conversion of client funds: "Other offenses might be excused, but conversion to his own use of the property of his client is an offense that cannot in any degree be countenanced." *People ex rel. Black v. Smith* (1919), 290 Ill. 241, 251.

In the absence of mitigating circumstances, such a gross violation of an attorney's oath calls for disbarment. (*In re Braner* (1987), 115 Ill. 2d 384, 394.) Respondent primarily relies upon his youth and inexperience in mitigation. This reliance is misplaced: inexperience in the practice of law is no excuse for the intentional conversion of a client's money. We agree with panel member Popejoy that no mitigating factors exist. Accordingly, we order respondent disbarred.

*Respondent disbarred.*